FREDERICK SEYBELL *v.* THE NATIONAL CURRENCY BANK.

A purchaser in good faith, for a valuable consideration of government securities, transferable by delivery, acquires a title valid against the world, and to constitute want of good faith, there must be knowledge of the want of title in the seller, or the means of knowledge, to which the purchaser willfully shut his eyes (following *Murray* v. *Lardner*, 2 Wallace, 110).

It will not suffice that there was on the part of the purchaser a want of care and caution, or gross negligence, or a knowledge of circumstances which would excite suspicion in the mind of a prudent man, the rule in respect to *mala fides* being a question of honesty or dishonesty, of the existence of guilty knowledge, or of that willful ignorance which is equivalent to it.

Where the only evidence of *mala fides* on the part of the purchaser (a bank) of stolen government bonds, was that a printed description of the bonds and a notice of their loss by robbery had been left at the bank the day after the loss, it not appearing that such notice was ever seen by the officers of the bank, and also that it was the avowed rule of the bank to disregard such notices,—*Held*, in an action against the bank by the owner of the stolen bonds for their conversion, that it was error to charge the jury that "if the defendants either had, or with reasonable care and attention might have had, notice of the loss, the plaintiff was entitled to recover," as this was in effect holding that a purchaser of a negotiable government bond, in the usual course of business, for value, acquired no title, if he might, by the exercise of reasonable care and attention, have ascertained that it had been stolen.

The custom of the defendants to disregard printed notices of lost and stolen bonds was properly submitted to the jury as evidence from which bad faith might be inferred; but the defendants should have been permitted to show from the magnitude of their dealings in such securities, and the amount in circulation, and the amount of them lost and stolen, that it was impracticable to keep a record of, or to regard, such notices.

APPEAL by the defendants from a judgment entered at the trial term on the verdict of a jury.

The action was brought for the conversion of two United States bonds, of which the defendants claimed to be purchasers for value and with notice. It appeared on the trial that the plaintiff, on the 12th September, 1865, was the owner and in possession of (with others) two United States bonds, each for one thousand dollars, issued under the Act of July 17, 1861, and numbered respectively, 37,864 and 37,865. On the evening of that day they were stolen from him; he immediately notified the police, caused handbills announcing the robbery to be distributed among the banks and brokers before ten o'clock

the next morning. He also telegraphed to the Secretary of the Treasury, and advertised the loss in three newspapers. Being informed by the Treasury Department on the 22d September, that the defendants had presented these bonds for conversion on the 19th, he called on them and demanded the bonds, stating that he had sent them a printed notice of the robbery the morning after its occurrence. He was told by the defendants' cashier that "they did not care for the notice." The bonds in question were purchased by the defendants on the 13th September, at a fair market valuation, from whom did not appear. The various exceptions taken at the trial are fully stated in the opinion of the court. The presiding judge charged the jury among other things :

"The theft having been proven, it devolves on the defendants to show that they purchased these bonds, which are payable to bearer, and therefore pass by delivery, giving value for them.

"He claims that immediately upon discovering his loss, and on the same evening that it occurred, he notified the police and caused circulars to be printed, one of which has been produced before you, advising the public of the misfortune, and cautioning them against purchasing the stolen securities ; and he insists that the evidence shows that early on the next morning, and before the usual business hours, some of these circulars had been delivered at the defendants' place of business, by means of which they either had, or with reasonable care and attention might have had, notice of the loss, and if he be correct, then he will be entitled to your verdict.

"Did the notice ever reach the defendants? If it did, and they chose to disregard it, then they are not purchasers in good faith, because if they purchased after notice, or willfully shut their eyes against notice, the law considers the purchase to be made in bad faith. In other words, a purchase after notice implies bad faith.

"If, however, you conclude that the circular was delivered, and that it came to the notice of the defendants, or might have done so but for their own act, and that, notwithstanding that, the defendants saw fit to buy these bonds, then they are not owners of them in good faith, and your verdict must be

for the plaintiff, because the law does not permit parties to buy and retain stolen property upon the plea that to take notice that it has been stolen would so interrupt their business as to render it impracticable to conduct it."

The jury returned a verdict in favor of the plaintiff for the full value of bonds.

The defendants appealed to general term.

*E. More,* for appellants.

Though the bonds were stolen from the plaintiff, if defendant was a *bonâ fide* purchaser for value, plaintiff cannot recover (*Swift* v. *Tyson,* 16 Peters, 1; *Goodman* v. *Simonds,* 20 How. U. S. 343; *Lardner* v. *Murray,* 2 Wallace U. S. 110). The case of *Goodman* v. *Simonds* shows how the ancient rule has been modified in favor of the purchaser, until it is now settled: 1. That the onus is on the assailant to show bad faith. 2. That nothing short of *actual dishonesty* will defeat his title. In *Lardner* v. *Murray,* the court says that in view of the volume constantly increasing of these securities, in which a large portion of our wealth is invested, while the courts should not so "shape and apply the rule" as to facilitate fraud, "*they should not forget the con-siderations of equal importance which lie in the other direction.*" The presumption being that we bought in good faith, we claim in this case, that we bought of one who was himself a *bonâ fide* holder. The notice was left in the bank before banking hours. It was error to leave it to the jury to guess whether it came to defendant's notice, or would, but for defendant's fault; as matter of law it was no notice, and it is a question of law (*Birdsall* v. *Russell,* 29 N. Y. 220).

*William R. Stafford,* for respondents.

By the Court.—Daly, F. J.—It was held in *Murray* v. *Lardner* (2 Wallace, 110), that a purchaser in good faith, for a valuable consideration, of government securities, transferable by delivery, acquires a title valid against all the world, and that to constitute want of good faith, there must be knowledge of the want of title; or, as Baron Park said, in *May* v.

*Chapman* (16 Mee. & Welsb. 361), the means of knowledge, to which the purchaser willfully shuts his eyes. It will not suffice that there was, on his part, a want of care and caution, or gross negligence, or a knowledge of circumstances which would excite suspicion in the mind of a prudent man, the rule in respect to *mala fides* being a question of honesty or dishonesty; of the existence either of guilty knowledge, or of that willful ignorance which is equivalent to it.

This decision, though not of controlling authority in a State tribunal, is entitled to the greatest weight in view of the circumstances under which it was decided. There had been a previous ruling of the court to the same effect in *Goodman* v. *Simonds* (20 How. 343), a case which was most elaborately argued, and in which all the authorities bearing upon the subject, either in this country or in England, were reviewed. The ruling of the court in this case was deliberately reconsidered in *Murray* v. *Lardner*, the leading English authorities were again examined, the reasons which had satisfied the court before were again maturely weighed, and this ruling was sustained by an unanimous decision. A judicial conclusion so deliberately arrived at, by the highest court in the nation, upon a point which affects the whole commercial world, is not only entitled, as I have said, to the greatest weight, but should be regarded as settling the law in this country.

The defendant in the case now before us, is a banking corporation dealing largely, as they offered to show, in government securities. The two bonds, for the conversion of which the action was brought, and which were stolen from the plaintiff, were bought by the defendants in the usual course of business, at a fair market value. The clerk or officer by whom they were purchased had left the bank nine months before the trial, and was, by report, in the State of Iowa. It appeared, however, by the books of the bank, and by the testimony of the cashier, that the two bonds were purchased from the 13th to the 18th of September, 1865; the entries indicating that the purchase was made on the 13th, the day after the robbery. The market rate on that day was between 107 and 108, varying from 107 to 107⅞ and they were bought at 107½. A purchase like this, by a bank, at their fair market value, and in

the usual course of business, of government bonds which pass by delivery, was conclusive upon the question of good faith, unless the plaintiff could show that the defendants purchased with a knowledge of the robbery, or with the means of knowledge at hand, which they intentionally avoided.

The evidence relied upon to show this was, that a printed handbill announcing the loss and describing the bonds, was, on the morning after the robbery, left before 9 o'clock, on the desk of the cashier of the bank, and on the desk opposite; but it was not shown that the handbill was seen or came to the knowledge of any of the officers or employees of the bank. The plaintiff testified that he called upon the cashier after the 23d of September, and told him that he had sent to the bank a printed notice of the robbery, and that the cashier replied, we don't care for notice, which the cashier in his testimony qualified by saying that he told him that he could not pay attention to notices, or something like that, which he said was true. " We buy and sell," he said, " bonds without any regard to these notices left in the office; we look at notices from time to time, but we keep no record of them ; no instructions are given by me to the clerks or officers to bring the notices to me personally." This was all the evidence relied upon to show *mala fides*. It was, to say the least, very slight, and was submitted to the jury by the court, with the instructions that if the defendants either had, or with *reasonable care and attention* might have had, notice of the loss, the plaintiff was entitled to recover, to which the defendant excepted. The exception was well taken, as this was in effect holding that a bank, broker, or other person, who buys a negotiable government bond, in the usual course of business, and pays the fair market value for it, acquires no title if he might by the exercise of reasonable care and attention have ascertained that it had been stolen. A rule like this would make it the duty of the bank to take notice, at their peril, of all printed notices sent to them, of the loss of government bonds, bills, or other negotiable securities in which they dealt, to keep an accurate record of all information of the kind sent to them, and to consult it in every instance, at the risk of liability, before they ventured to pur-

chase a bond or to discount paper. They would have in fact to institute an inquiry in every case, a rule which as Lord Kenyon said, in *Lawson* v. *Weston* (4 Esp. 56), would paralyze the circulation of all the paper in the country; the defendants offered to show that they dealt largely in government bonds, receiving and paying them out as money; that United States securities, of the description of the two bonds in question, are payable to bearer; that they are bought and sold daily in the market, and are received and paid out by banks, brokers, and bankers, as money; that they pass from hand to hand by delivery, and are always paid for in cash on delivery; that the amount, in circulation is very great, and that very large amounts, *several millions,* have been stolen and advertised; that the amount in circulation is so large, the amount stolen or lost so great, and the notices of thefts and losses so frequent, that it would be impossible for the defendants to keep track of those lost or stolen without stopping their business; that notices are constantly thrown in their bank of such thefts or losses, with lists, numbers, and descriptions, and that if they were bound to take notice of all such notices, it would be impracticable to deal in government securities; which offer on their part was excluded. All, in my judgment, that could be legitimately inferred from the omission of the defendants to pay attention to such notices when they purchase negotiable securities of this kind in the regular course of business, and pay the market value for them, would be the want of care and caution, or at best, gross negligence on their part, and this, according to the rule laid down in the two cases before referred to, of *Goodman* v. *Simonds* and *Murray* v. *Lardner,* would not be sufficient to destroy their title. Under certain circumstances, gross negligence may be evidence tending to show *mala fides* (*Goodman* v. *Harvey,* 4 A. and Ellis, 870), and assuming that the habit of the bank to pay no attention to such notices, was evidence from which the jury might infer that the defendants acted in bad faith, then the evidence which they offered, and which the court excluded, should have been received, for it was most material upon the question of a dishonest intent. It was material as showing that their motive was not to facili-

tate the sale of bonds dishonestly acquired for their own pecuniary benefit, but that they did so because it was impracticable from the magnitude of the amount of such bonds in circulation and the large amount that had been lost or stolen, to do otherwise. If the evidence given was sufficient to submit the question of a want of good faith to the jury, then the defendants were certainly entitled to the benefit of what they offered to show, and for this reason a new trial should be granted.

New trial ordered.