[No. 8,985. In Bank.—April 23, 1885.]

LOUIS McLANE, SURVIVING TRUSTEE, RESPONDENT, *v.* THE PLACERVILLE AND SACRAMENTO VALLEY RAILROAD COMPANY ET AL., APPELLANTS.

RAILROAD CORPORATION—POWER TO ISSUE BONDS—MORTGAGE—CONSTRUCTION OF ROAD.—Section 15 of the act of 1861, as amended by section 1 of the act of May 14, 1862, authorizes a railroad corporation, by a majority vote of its board of directors, to issue bonds secured by a mortgage of its property and franchises, in payment of debts contracted, or contracts made, for constructing and completing its road.

Id.—Trust Deed—Railroad Mortgage—Rights of Bondholders.—The instrument sued on, although executed to trustees, and in form a conveyance in trust, is a mortgage of the form usual with such securities executed by railroad corporations, and the holders of the bonds secured by it are entitled to the same benefit they would have if actually made parties to the instrument.

Id.— Action to Enforce Mortgage—Default in Interest—Receiver— Purchase of Rolling Stock.—The mortgage provided that upon default in the payment of interest for one year, the trustees or the survivor of them should be entitled to take possession of the property mortgaged, hold it, receive and collect the income and profits arising from it, and apply the same to certain stated purposes. Held, that upon the happening of that event, a court of equity had power, in an action to enforce the specific execution of the mortgage, to appoint the surviving trustee a receiver of the mortgaged property, to put him in possession thereof pendente lite, and the road being without rolling stock or other equipments, to authorize him to make provision for operating the road by purchasing the necessary equipments, so as to secure an income and profits.

Id.—Lien of Receiver—Expenses—Counsel Fee—Costs— Care of Trust Property.—The expenses of the trustee and receiver reasonably incurred in the discharge of his trust, are a lien upon the trust property prior to that of the bondholders. Among the expenses which should be allowed him are reasonable fees for counsel employed by him in the proper discharge of his trust, the cost of litigation, and the expenses in taking care of, protecting, and repairing the property in his charge.

Id.—Under the circumstances of the case, held, that money expended for rolling stock and machinery should also be allowed.

Id.—Sale of Mortgaged Property—What Circumstances will Authorize.—It appeared that the mortgagor was insolvent ; that an execution purchaser under a junior incumbrance would do nothing to discharge the interest ; that the operation of the road by the trustee would result in a loss ; that the trustee had no proceeds with which to make repairs ; and that the road, if unused, would necessarily decay. Held, that the court had power to order a sale of the property, although the mortgage did not in terms authorize a sale upon default in the payment of interest, and the bonds had not yet matured.

Bona Fide Purchaser—Bonds—Over-due Coupons.—A purchaser of railroad bonds in good faith, and for their market value, may be a bona fide holder, although some of the interest coupons attached thereto are past due and unpaid at the time of the purchase.

Appeal from a judgment of the Superior Court of the city and county of San Francisco.

Action to compel the specific execution of the provisions of a trust mortgage. The facts are sufficiently stated in the opinion of the court.

W. H. L. Barnes, for Appellants.

The issuing of the bonds and making of the mortgage were void, because they were not issued and made by the unanimous

concurrence of the directors. (Railroad Act 1861, § 15; *Forbes* v. *San Rafael T. Co.*, 50 Cal. 340; *Coryell* v. *Managers of Bridge Co.*, 9 N. J. Eq. 457; *Corn Exchange* v. *Cumberland Coal Co.*, 1 Bosw. 436.) The court erred in appointing a receiver. (Code Civil Proc., § 564, sub. 2; *Pullan* v. *C. & C. R. R.*, 4 Biss. 35; *Wilmer* v. *Atlanta etc. R. R. Co.*, 2 Wood, 409; *Shotwell* v. *Smith*, 3 Ed. Ch., 588; *Tomlinson* v. *Ward*, 2 Conn. 396.) In no event was the plaintiff entitled to be put in possession of the mortgaged property *pendente lite*. (Code Civil Proc., § 744.)

*George Cadwalader, D. M. Delmas*, and *Wm. T. Wallace*, for Respondent.

THORNTON, J.—The complaint herein was demurred to by the Sacramento and Placerville R. Co., on the grounds thus stated by the pleader:

"First—that the said complaint does not state facts sufficient to constitute a cause of action.

" That it appears upon the face of the complaint, that the instrument therein set out and alleged to be a mortgage was not made and executed in conformity with the statute authorizing the said defendant, the Placerville and Sacramento Valley Railroad Company (a corporation), to make and execute such instrument.

" That it appears upon the face of said complaint that the board of directors of said corporation did not by unanimous consent order and direct the said mortgage to be made or executed, or the corporate bonds therein mentioned to be executed or delivered, and that neither said bonds nor mortgage were or are valid as a corporate act of said defendant."

The validity of the written security on which the action is brought, as well as of the bonds mentioned in the complaint, to secure which the security was executed, is by the demurrer attacked.

The security in question was executed in 1864 by the Placerville and S. V. R. Co., to secure the payment of certain bonds therein mentioned; and it is contended that it is invalid, because not authorized by the unanimous concurrence of the directors of the corporation above named.

To sustain this contention, we are referred to section 15 of

the act of 1861, concerning the incorporation of railroad companies (Stats. 1861, 607), as amended by section 1 of the act of May 14, 1862. (Stats. 1862, 547.) This section, as amended, is as follows :

" Such companies shall have power to borrow, from time to time, on the credit of the corporation, and under such regulations and restrictions as the directors thereof, by unanimous concurrence, may impose, such sums of money as they may deem necessary for constructing and completing their railroad, and to issue and dispose of bonds or promissory notes therefor, in denominations of not less than five hundred dollars, and at a rate of interest not exceeding ten per cent. per annum; and, also, to issue bonds or promissory notes, of the denomination aforesaid, and at the rate of interest aforesaid, in payment of any debts or contracts for constructing and completing their road, with its equipments, and all else relative thereto; *provided*, however, that the amount of bonds, or promissory notes, issued by such companies for the purposes aforesaid, shall not exceed, in all, the amount of their capital stock : and to secure the payment of said bonds or notes, may mortgage their corporate property and franchises. And the directors of such companies shall also provide, in such manner as to them may seem best, a sinking fund, to be specially applied to the redemption of such bonds on or before their maturity ; and may also confer on any holder of any bond or note so issued for money borrowed, or in payment of any debt or contract for the construction and equipment of such road, as aforesaid, the right to convert the principal due or owing thereon into stock of such companies, at any time within eight years from the date of such bonds, under such regulations as the directors may adopt."

Attention is also called to the following recitals in the instrument or security:

" And, whereas, the said company has heretofore, through its lawfully authorized agent in New York city, contracted certain liabilities and indebtedness, and has entered into certain negotiations and contracts for large amounts of railroad iron and rolling stock for its line of road, and for constructing and completing the same road, with its equipments, and for such further amounts of such iron and rolling stock as the company, through

its board of directors, may from time to time require, or desire to purchase for like use in constructing, completing and equipping the said road:

" And, whereas, the said company is desirous, and has, through its lawfully authorized agents, undertaken and agreed to issue its bonds of the denomination of one thousand dollars each, and at a rate of interest not exceeding ten per centum per annum, for the purpose of paying and meeting the said debts, liabilities and contracts already incurred and entered into, and such as may be further incurred or entered into for the purposes aforesaid—that it is to say, for such railroad iron and rolling stock alone, and also to secure the said bonds by first mortgage upon the corporate property and franchises of the company."

It is afterwards recited that the bonds were ordered to be issued in conformity with the premises, and for the sole purpose aforesaid—manifestly referring to the recitals above given. This security was made a part of the complaint.

The section (fifteen) relied on evidently confers by its first clause, ending with the words " at a rate of interest not exceeding ten per cent. per annum," a different and distinct power from the clause just succeeding.

The first clause confers the power " to borrow, from time to time, on the credit of the corporation, and under such regulations and restrictions as the directors thereof, by unanimous concurrence, may impose, such sums of money as they may deem necessary, for constructing and completing their railroad, and to issue and dispose of bonds or promissory notes therefor," etc. The second clause has its antecedent, the words, " such company shall have power," with which the first clause commences, and which is also its antecedent; and the words " and also to issue bonds or promissory notes, of the denomination aforesaid, and at the rate of interest aforesaid, in payment of any debts or contracts for constructing and completing their road, with its equipments, and all else relative thereto," are qualified by such initial words; so that this last clause is substantially, such company shall have the power also to issue bonds or promissory notes, etc. Here, it is plain to see, is a power given to issue bonds or promissory notes, under like pro-

visions as to denomination and interest as in the first clause, "in payment of any debts or contracts for constructing and completing their road, with its equipments, and all else relative thereto "—a power differing and distinct from the other, as will be evident on a careful reading.  The power first given in the section is to borrow money for a purpose designated; the one secondly given is to make bonds or promissory notes, and issue them in payment of debts or contracts for constructing and completing the road.  The power to mortgage the corporate property and franchise to secure the payment of such bonds or notes, given in the proviso following the second clause, applies alike to the notes and bonds referred to in the first clause, and is common to the bonds and notes issued under either power.

Powers are conferred by the ninth section of the act of 1861 (Stats. 1861, 611), and by this section as amended in 1863, (Stats. 1863, 610), on the directors, to manage the affairs of the company, make and execute contracts of whatsoever nature or kind, fully and completely to carry out the objects and purposes of the corporation, in such way and manner as they may think proper, and to exercise generally the corporate powers of such company.  These powers are given to boards of directors, and are usually exercised by a quorum, which, unless changed by statute or by-law, is a majority of the board.  The above powers could be exercised by a majority of a quorum under the ninth section, unless restrained as above pointed out.

In construing any words apparently restricting and limiting the powers thus conferred, which are broad enough to include the power to borrow money, the restricting and limiting words certainly ought not to be invested with a meaning beyond their import.  The two clauses of the fifteenth section ought not to be held restrictive beyond their plain and obvious meaning, especially when we find such broad and ample powers conferred on the directors.  We find no words in this or any other act restraining the board of directors from ordering, by a majority vote, the issuance of such bonds as are in controversy herein, which were issued to pay for the iron used in laying the track.

We perceive no violation of the statute in the board of directors, by a majority vote ordering the issuance of bonds to pay debts contracted, or contracts made for iron for constructing

and completing the road of the corporation.   Indeed, at common law, a corporation has power to issue a bond or note to pay a debt.   (*Com.* v. *Smith*, 10 Allen, 448; *Commissioners of Craven* v. *Atlantic and N. C. R. Co.*, 77 N. C. 289; *Miller* v. *N. Y. and Erie R. Co.*, 13 How. N. Y. 374; 8 Abb. Pr. 431; *Dana* v. *Bank of U. S.*, 5 W. & S., 223.)   We do not see why it has not just as much right to do so, under the general law of this state, as a natural person.   Nothing more than this was done in the case before us.

The power to make a mortgage, to secure the payment of such bonds as was done herein, is too clear to admit of dispute.

Some question is made as to the nature of the instrument sued on.   We think it a mortgage, executed and issued in the usual mode and form of railroad mortgages.   (See Jones on R. R. Mortgages, § 68, and citations; 2 Jones on Mortgages, §§ 1764–1771; Opinion of Rives, J., in *Taylor* v. *Stearns*, 18 Gratt., 244–278.)   But it is immaterial, in our judgment, what the security is called.   Though executed to trustees, and in form a conveyance in trust, it is to all intents a mortgage— in essence a mortgage, taking the form usual with such securities executed by railroad corporations.   From an apparent necessity, and for the convenience of those interested, the security takes the form of a trust deed, and thus becomes a contract between the corporation and the persons who may become holders of the bonds secured by it, who are entitled to the same benefit they would have if actually made parties to the instrument.

The same questions and some others are substantially raised by the demurrer of the defendant, the Placerville and Sacramento Valley R. R. Co.   We have examined these questions, and find none of them tenable.

In our judgment, the bonds and mortgage are valid securities, and the demurrers were properly overruled.

The mortgage security herein was executed to Danforth N. Barney, of New York, and the plaintiff, Louis McLane, as trustees for those who might become the holders of the bonds mentioned in it, among which are those set forth in the complaint.   The rights and property transferred by this security were conveyed to the aforenamed as trustees, and the survivor of them.   These trustees, or the survivor of them, were empow-

ered after default was made in the payment of the principal of the bonds, or any part thereof, or when default should be made for a whole year in the payment of interest on any of such bonds, peaceably and quietly to have, hold, occupy, possess and enjoy all and singular the rights, privileges, franchise, property and other premises granted, described in the mortgage, without let, suit or hindrance, molestation or eviction of the mortgagors, their successors, or of any persons claiming or to claim by, from, or under them; and may by themselves, their officers or agents, take, receive and collect the income and profits of the railroad of the company mortgagor, first applying the same to the payment and discharge of all current expenses of such railroad, and the needful repairs thereon, and next to the payment of all taxes, and then to the payment of the interest and principal of such bonds, in such manner as they may deem proper. After this follows, in the mortgage, a covenant on the part of the mortgagor, and its successors, and all and every person claiming by, from, or under them the premises, or any part or parcel thereof, "after such default to the amount aforesaid," to "make, do and execute all and every such further and other lawful and reasonable act and acts, thing and things, assurance and assurances, device or devices, in the law whatsoever, for the further and better granting and assuring all and singular the said premises, with the appurtenances, above bargained and sold, mentioned, or intended to be, unto the said parties of the second part, and the survivor of them, and the heirs of such survivor, or their assigns, by their or his counsel, learned in the law, shall be reasonably devised, advised, or required," with a further covenant that the premises conveyed are free and clear of all former grants, trusts, judgments, uses, taxes, etc., and also a covenant by the same party, warranting the title of the rights and premises conveyed, against all persons claiming under the mortgagor.

The default of the company mortgagor for one year in the payment of interest on the bonds in controversy having occurred, the action was brought by the plaintiff, as surviving trustee (Barney, the co-trustee, having died), to enforce *inter alia* the stipulations of the trust mortgage as to taking possession, and to authorize him, as such trustee, to take actual possession of

the road and other property mortgaged, and for the appointment of a receiver to take such possession, if the court should be of opinion that such officer should be appointed, instead of allowing the plaintiff to have possession. On motion made after hearing, an order was made, authorizing the plaintiff, who was appointed receiver, to take possession as prayed for.

It was recited in the order of appointment, that it appears to the court that the plaintiff is entitled to the possession of the property mortgaged, under the terms and conditions of such trust mortgage, or deed, and that to enable him more effectually to carry out and complete the trust delegated to him by said, mortgage, he should be appointed receiver of the said property, with full power to take and retain possession of the same.

The order proceeds as follows: " Therefore, it is ordered that the said plaintiff, as surviving trustee (and as receiver, to which position he is hereby appointed for that purpose), take possession of all said property, and keep the same, and exercise the powers over said property conferred by said trust mortgage, or deed, until the further order of the court, unless the defendant, within fifty days after the service on its respective agents or attorneys of a copy of this order, pay to the said plaintiffs the amount due on the unpaid bonds and coupons issued and secured by said trust mortgage or deed; and it is further ordered that the said Louis McLane, plaintiff, execute in this court a bond, with two sufficient sureties, in the sum of $10,000, conditioned for the faithful performance of his duties as such receiver."

It appears further that the receiver subsequently filed a bond as directed, and took possession of the road and property mortgaged.

This order is attacked as erroneous and unauthorized, by the appellant's counsel, and various questions in regard to it are discussed in his brief.

It is urged that the question is not before us. But having examined the question, we are clear in the opinion that the court committed no error in making this order. In deciding this question, we are not to be considered as holding that it is regularly before us. Entertaining some doubt whether it can be reviewed in this case on an appeal, still, from the nature of

the judgment entered herein, we think it best to examine the matter as we have, since we entertain no doubt, as above stated, on the points discussed in regard to it.

It is contended on behalf of the appellants, that the court erred in appointing the trustee receiver, and in putting him as such trustee and receiver in the possession of the property— first, because a plaintiff in a foreclosure suit is not entitled to a receiver, unless it appears that the mortgaged property is in danger of being lost, removed, or materially injured, or is insufficient to discharge the mortgage debt. Second, because the property, as it appears from the face of the complaint, was insufficient to discharge the mortgage debt. Third, because, in no event, was the plaintiff entitled to be put in possession of the mortgaged property *pendente lite;* and to sustain this last ground, section 744 C. C. P. is cited.

In reply, we have to say that this action is not one to foreclose a mortgage. It is a suit brought to enforce the specific execution of the terms and stipulations of a mortgage by which, on the happening of a specific event, the trustees or the survivor of them are entitled to take possession of the property mortgaged, hold it, receive and collect the income and profits arising from it, and apply such income and profits as are stated above. The *casus fœderis*, upon which the surviving trustee was to take possession, having occurred, on his application the court made the order. This is so clearly within the province of a court of equity, that we can see no reason to doubt its power, or the regularity of the proceeding. It comes within the provisions of section 564, subdivision 6, of the Code of Civil Procedure, authorizing such appointments, where receivers have heretofore been appointed by the usages of courts of equity. There are several cases where such a proceeding has been had, which have been sanctioned and approved by courts of the most undoubted learning and ability. (See *Shepley* v. *The Atlantic & St. Lawrence and G. T. R. Co.*, 55 Me. 395; *Shaw* v. *Norfolk County R. Co.*, 5 Gray, 162; *American Bridge Company* v. *Heidelbach*, 94 U. S. 798; *Gilman* v. *Ill. Tel. Co.*, 2 Bland, 665.)

We quote here, as showing the ground on which such proceeding rests, the observations of the court, per Walton, J., in the case above cited from 55 Maine :

" We do not understand that by this bill the trustees seek to obtain a decree of foreclosure of their mortgage. The objection, therefore, that this court has no jurisdiction in equity to decree such foreclosure, is not well taken. The bill does not ask for such a decree, nor do we understand that possession of the mortgaged property is claimed by virtue of any rule or express provision of law. The objection, therefore, that they have not performed those₄ acts which the statute required to make conditions precedent to such a right, is equally foreign. What the trustees claim is, to have their contract, by which it was agreed that in a certain contingency they should have possession of the mortgaged property, specifically performed. They do not claim the possession as the result of a rule of law (except so far as the law requires parties to keep and perform all their lawful contracts), but as the result of an express agreement. That the court has jurisdiction of the plaintiff's bill we cannot doubt."

The questions under consideration were substantially decided by this court adversely to the contention of appellant's counsel, in *S. & P. R. Co.* v. *Superior Court of S. F.*, 55 Cal. 453, which decision we approve as correct.

The subsequent orders made in the cause in relation to the trustee and receiver are, in our judgment, within the power of the court below, and without error. No facts appear in the cause in any way which show error. They are stringent, and in their very essence must be so. The appointment of a receiver is an equitable remedy, and has been said to be in effect an equitable execution. (Jeremy's Eq. Jur. 249.) The remedy is a provisional one, and bears a similar relation to courts of equity that proceedings in attachment bear to courts of law. (See *Cincinnati S. & C. R. Co.* v. *Sloan*, 31 Ohio St. 1.) The taking possession of the property of another is a seemingly harsh proceeding, but justified by the circumstances which demand its adoption, either arising from contract or the general rules of law. But the court which adopts this procedure is and should be careful to protect the interests of all concerned, and indemnity for all damage which the adverse party suffers is usually provided against by a bond with ample and sufficient sureties.

Under these orders the plaintiff trustee, as receiver, took possession of the road.

On the 14th of April, 1881, the court made the following order:

[Title of court and cause.]

"The order to show cause why the trustee, and receiver, should not have power to provide for the operation of the railroad committed to his charge by the order of the court herein, and to mortgage said property in order to acquire the rolling stock necessary to operate it, and also to lease said road, having been duly notified and heard by said court, and the arguments of counsel for both parties hereto having been duly considered, the court, now being sufficiently advised in the premises, doth now order as follows, to wit:

"That said trustee and receiver herein shall have, and is hereby invested with, the following additional powers and functions, that is to say: He shall have the necessary power to lease said railroad committed to his charge, upon such terms and conditions as may seem to him reasonable and just, and likewise, in his discretion, he shall have power to operate said railroad; and in order to do this he may hire or conditionally or absolutely purchase the rolling stock, tools and machinery necessary for the due equipment and operation of said railroad ; *provided*, that the indebtedness for such equipment shall not exceed fifty thousand ($50,000) dollars, that the term of its creation shall not be for a period longer than two years, and the rate of interest shall not exceed ten per cent. per annum ; and the said trustee and receiver shall have power to secure the payment of such indebtedness, created for the purpose aforesaid, by chattel mortgage on the rolling stock, tools, and machinery purchased by him for the operation of said railroad, and also by a mortgage on said railroad, payable out of the earnings or income of said railroad, which he shall have power to pledge, mortgage, or hypothecate for such purpose ; and said trustee and receiver shall have the power to execute the deeds, contracts, leases, mortgages, bonds and obligations necessary to give effect to the powers herein granted him. The railroad herein mentioned is that described in the deed of trust annexed to plaintiff's complaint in this cause, and is known as the railroad connecting Folsom, in Sacramento County, with Shingle Springs, in El Dorado County, California, and which was con-

structed by the Placerville and Sacramento Valley Railroad Company."

We are of opinion that the court had power to authorize the trustee and receiver to make provision for operating the road, so as to secure an income and profits. The powers conferred on the trustees by the mortgage authorized them, on the default in the payment of interest mentioned above, to take possession of the road and operate it, using the income and profits therefrom to make the payments above mentioned. This much is conceded by the counsel for appellant in his brief. It appears that the mortgagor company had no rolling stock or other equipments, and that the trustee and receiver under the foregoing order of the court did purchase some rolling stock and machinery for the use of the road, for which he expended money in the discharge of his trust, and incurred some indebtedness. The facts are set forth as follows in the findings:

"At the commencement of this suit, the court to whose jurisdiction over this case the present court succeeded, appointed a receiver to take possession of, manage and control, and operate the railroad described in said trust mortgage, Exhibit A, pending the trial of this cause; which said receiver duly qualified, and took and held possession of said railroad, pursuant to the said order of court made in this cause. And in taking care of, protecting and repairing the said property confided to his charge, and in purchasing rolling stock and machinery for the use of said road, and for counsel fees in rightfully and successfully defending suits brought against him as such receiver to recover the property in his charge, has paid, laid out, and expended the sum of $19,356.26, and has become entitled to the further sum of $800 for his services as such receiver; and his said account being now passed and approved for the foregoing causes and amounts; and there being in fact the sum of $20,-156.26 due to said receiver."

The court also found other facts as follows:

"That all the bonds issued under and secured by the trust mortgage, Exhibit A, attached to and made part of the complaint herein, have been paid, except those certain bonds made payable in currency, and numbered respectively 342, 343, 344, 345, 346, 489, 490, 498, 499, and 500.

" That on said bonds there was due and unpaid on the 1st day of July, 1882, the sum of $26,000, no part of which has since been paid ; said bonds (a copy of one of which is attached to the complaint, marked Exhibit B) were delivered, by the railroad company executing them, in part payment for the railroad iron used in laying the track of said company's road, described in said trust mortgage, Exhibit A.

" That one John G. Kittle was, at and before the commencement of this suit, and is now, the owner and holder of said bonds, having purchased them in good faith and for their market value, but after some of the coupons on each of said bonds were past due and unpaid.

" That said trust mortgage is the valid act and deed of the Placerville and Sacramento Valley Railroad Company, and was executed at the time it purports to have been for the purposes therein set forth, one of which was to secure the payment of the principal and interest of the so-called currency bonds, the Kittle bonds aforesaid being part and parcel thereof. That subsequently to the execution of said trust mortgage A, and the issue of the currency bonds aforesaid, the Placerville and Sacramento Valley Railroad Company became indebted to the express and banking concern of Wells, Fargo & Co., for money borrowed, to the extent of $200,000 ; and for the purpose of securing the payment of such indebtedness, executed and delivered to Wells, Fargo & Co. a mortgage of its corporate property and franchise, being the same embraced and described in said trust mortgage Exhibit A. That default having occurred in the payment of said indebtedness, Wells, Fargo & Co. obtained a decree of foreclosure and order of sale, in the usual form, of the said mortgaged premises, and thereunder sold the same to one William Alvord, for $166,400, who in time sold and conveyed the property so acquired by him to Messrs. Stanford, Huntington and Hopkins, who in time conveyed it to the defendant herein, styled the Sacramento and Placerville Railroad Company, of which corporation they are now, and were at the time mentioned, the principal stockholders. That the said Alvord, and each of the purchasers aforesaid through him, had at the times of their respective purchases, notice of the said trust instrument Exhibit A, and of the terms thereof, and of the bonds

secured thereby, and took said property subject to and in subordination to the liens created thereby.

"The Placerville and Sacramento Valley Railroad Company, since the sale of its property as aforesaid to Alvord, has transacted no business, and has been insolvent, and has had but a nominal existence. It never owned any of the rolling stock or machinery wherewith its road was operated. The Sacramento and Placerville Railroad Company is the offspring of the amalgamation of the two railroad companies known as the Sacramento Valley and the Folsom and Placerville, and was, at the commencement of this suit, in the possession of the railroad described in the trust mortgage Exhibit A, and was operating the same as part of its line between Sacramento and Shingle Springs, by way of Folsom."

The conclusions of law reached by the court were as follows :

"First.—That the plaintiff, as surviving trustee, have delivered to him, by the receiver herein, the possession of the railroad described in said trust mortgage, Exhibit A, to be held by him subject to the trusts and conditions therein contained ; and that plaintiff recover his costs herein (other than the receiver's costs) against the Sacramento and Placerville Railroad Company, taxed at $116.48.

"Second.—That the sum of $20,156.26, due the receiver herein, be adjudged a lien against said railroad, and paid, if necessary, by the sale thereof; and that the amount thereof be paid to him by the defendants herein within ten days after receiving, through their attorneys in this case, written notice of the entry of the final decree herein ; and upon default being made in the payment of said sum, that the said plaintiff, as surviving trustee herein, shall, after giving such notices as are required by law in case of the sale of real estate under execution, sell to the highest bidder, for cash, said railroad, its franchises and equipments ; and that he deliver possession thereof to the purchaser at said sale, upon the payment of the purchase money. That the money arising from said sale shall, after the costs of making such sale are paid, be disbursed as follows :

"First.—To the payment of the amount due the receiver, as aforesaid.

"Second—To the payment of the costs of this suit, taxed as aforesaid.

" Third.—To the payment of John G. Kittle, or to the holder of the said ten bonds described in finding one hereof, the sum of $26,000, with interest at the rate of 7 per cent. per annum from July 1, 1882; and,

"Fourth.—Any remainder existing, to the Sacramento and Placerville Railroad Company."

A decree was made in accordance with the foregoing decision. The following is the decree:

" This cause having been heretofore argued and submitted, and now having been duly considered, the court doth order, adjudge and decree as follows, to wit:

" That the plaintiff, as surviving trustee in the trust mortgage of March 14, 1864, a copy of which is attached to the complaint in this cause, is entitled to have the possession of that certain railroad, constructed by the Placerville and Sacramento Valley Railroad Company, which said railroad begins at the town of Folsom, in Sacramento County, and which extends by the way of Latrobe to Shingle Springs, in El Dorado County, together with the rights of way of said railroad, its stations, side-tracks, depots and equipments, and all property appurtenant to said railroad.

" It is further ordered, adjudged and decreed herein, that the receiver heretofore appointed in this cause deliver said property to the plaintiff herein, as surviving trustee under said mortgage.

" And it is further ordered, adjudged and decreed herein, that the plaintiff recover the costs of this suit (other than the receiver's costs), taxed at $116.48, against the Sacramento and Placerville Railroad Company.

" It is further ordered, adjudged and decreed, that the amount due the receiver, settled at $20,156.26, be adjudged to be a lien against said railroad, its franchises and appurtenances, and paid by a sale thereof (if necessary), as hereinafter provided.

" It is further ordered, adjudged and decreed, that said defendants, within ten days after receiving, through their attorney, notice in writing of the entry of this decree, pay to the receiver in this case the sum of $20,156.26 ; and upon default being made, it shall be the duty of the plaintiff, as surviving

trustee aforesaid, to give such notices of the sale of said railroad, its franchises and appurtenances, as is done when real estate is required to be sold under an execution, and at the time and place appointed in such notices (which must be between the hours of 10 A. M. and 4 P. M., and in front of the City Hall of the city of San Francisco), to proceed and sell the aforesaid railroad, its franchises and appurtenances, at public auction, to the highest bidder for cash; and shall, upon the payment of such bids, execute to such purchaser a proper conveyance of the property sold, and deliver him possession thereof.

" It is further ordered, adjudged and decreed, that the plaintiff, as surviving trustee aforesaid, after deducting the costs and expenses of said sale, shall pay to the receiver the amount found due him as aforesaid, with legal interest from the date hereof; and shall then pay to John G. Kittle, or the holder of the ten currency bonds of the Placerville and Sacramento Valley Railroad Company, referred to in the findings, and numbered 342, 343, 344, 345, 346, 489, 490, 498, 499, and 500, on the surrender of said bonds, the sum of twenty-six thousand (26,000) dollars, with interest thereon from July 1, 1882, at the rate of seven (7) per cent. per annum.

" Any surplus remaining shall be paid to the Sacramento and Placerville Railroad Company."

It is objected that the expenditures of the trustee and receiver mentioned in the findings and decree, are not a lien upon the road and property conveyed. If the expenses were reasonably incurred in the discharge of the trust, we see no reason why they should not be a lien. Trustees are entitled to a lien on the *corpus* of the trust property, for all such disbursements. The law on this subject is so clearly laid down in *Renssalaer & Saratoga R. Co.* v. *Miller*, 47 Vt. 152, that we insert here what is said in that case on the point:

" It is apparent in this cause that the trustees, Miller and Knapp, held a position such as to entitle them to charge upon the subject matter of the trust such compensation and reimbursement as they ought to have by reason of what they did and incurred in the administration of the trust. (See Perry on Trusts, §§ 906, 907, 909, 910.) They were holding their position for the behoof of all the parties interested in the subject of the

trust; and, in the first instance, for the parties beneficially in-
terested in the first mortgage, viz : The Rutland and Washing-
ton R. R. Co., mortgagor, and the holders of the bonds secured
by said mortgage. The primary object of having said trustees
was to enable the security to be created and rendered effectual
for the bondholders. The expenses of a trustee in the execu-
tion of the trust are a lien upon the estate, and he will not be
compelled to part with the property until his disbursements are
paid. (Perry, § 907.) If the trust fund is insufficient for such
reimbursement, he may call on the *cestui que trust*, in whose
behalf and at whose request he acted, and recover of him per-
sonally reasonable compensation for the time, and trouble, and
money expended. (Perry, § 909 ; Hill, § 578.) Trustees have
an inherent and equitable right to be reimbursed all expenses
which they reasonably incur in the execution of the trust, and
it is immaterial that there are no provisions for such expenses
in the instrument of trust. If a person undertakes an office for
another in relation to property, he has a natural right to be re-
imbursed for all money necessarily expended in the performance
of the duty. (Perry, § 910.) The costs of winding up a trust
and distributing the money, and all expenses for documents,
deeds and other papers, must be paid from the trust fund. (Ib.
933.) The trustee's lien cannot be allowed to control the es-
tate in such manner as to destroy the trust ; but no conveyance
will be ordered or allowed until he is repaid. (Ib. 907.) The
concurrence of a co-trustee is not necessary for the incurring of
expenses, if the expenses are proper in themselves." (Ib. 912.
See also *Morison* v. *Morison*, 7 De Gex., M. & G. 214 ; Jones
on Railroad Securities, § 547.)

That the receiver should have been allowed reasonable fees for
counsel employed by him to aid him in the proper discharge of his
trust, we have no doubt. (*Cowdrey* v. *Galveston, H. & H. R. Co.*,
93 U. S. 352 ; S. C., 9 Am. Rail. Rep. 361.) That he should
be allowed costs of litigation, is equally clear. (Jones on R. R.,
§ 1547, and cases cited.) Expenses in taking care of, pro-
tecting, and repairing the property in the receiver's charge,
should also be allowed. This is so well established by decided
cases, that we consider it only necessary to cite some of them.
(*Meyer* v. *Johnston*, 53 Ala. 237–346 ; *Hoover* v. *Montclair &*

*Greenwood Lake Ry. Co.*, 9 N. J. Eq. 4; *Kennedy* v. *St. Paul & Pac. R. Co.*, 2 Dill. 448; *Stanton* v. *Ala. & Chat. R. Co.*, 2 Woods, 506; *Vermont & Can. R. Co.* v. *Vermont Cent. R. Co.*, 14 Am. Rail. Rep. 497, 546, 532.) Money expended in rolling stock and machinery has in some cases been allowed. (*Stanton* v. *Ala. & Ch. R. Co.*, 2 Woods, *supra; Meyers* v. *Johnston, supra.*) The circumstances under which this allowance was made do not appear in the findings. Nor do the circumstances under which many of those allowances were made appear. We must therefore presume that they are properly allowed. Error must appear; it cannot be presumed or conjectured. On the contrary, every intendment is in favor of the regularity and correctness of the ruling of the court below, it having jurisdiction of the subject-matter and parties. This court must start out in investigating error alleged, with the above intendment as a postulate, and the record must by its contents displace such intendment.

These facts do appear in the bill of exceptions. It was admitted:

"First.—The Placerville and Sacramento Valley Railroad Company is a corporation, organized in June, 1862, under the provisions of an act of the legislature of the State of California, entitled, 'an act to provide for the incorporation of railroads, and the management of the affairs thereof, and other matters relating thereto,' approved April 20, 1861, and of the several acts supplementary thereto and amendatory thereof. This corporation is organized for the purpose of building, equipping, and operating a steam railroad between Placerville, El Dorado County, and Folsom, Sacramento County.

"Second.—The Folsom and Placerville Railroad Company was a corporation, organized under the laws of the State of California, in the month of September, 1876, for the purpose of operating a steam railroad over the route of the company named in the foregoing paragraph.

"Third.—The Sacramento Valley Railroad Company was a railroad company, organized under the laws of the State of California, at a date prior to the organization of either of the aforesaid companies, for the purpose of operating and maintaining a steam railroad between Sacramento and Folsom.

" Fourth.—On the 13th day of April, 1877, the Folsom and Placerville Railroad Company and the Sacramento Valley Railroad Company were duly consolidated according to law, and upon such consolidation took the name of 'The Sacramento and Placerville Railroad Company,' which corporation is now in existence, and up to the time of the appointment of a receiver herein, was engaged in operating, as part of its route, the line hereinafter mentioned; that is to say, the railroad from Sacramento to Folsom, from Folsom to Shingle Springs, by the way of Latrobe—thus constituting one line from the city of Sacramento to Shingle Springs.

" Eighth.—In the year 1869 the Placerville and Sacramento Valley Railroad Company become indebted to the firm or corporation known by the name of Wells, Fargo & Co., in the sum of $200,000, and made a mortgage of all its property to one Charles E. McLane, as trustee of Wells, Fargo & Co., to secure the payment of its promissory note of $200,000, and interest thereon at the rate of 10 per cent. per annum.

" Ninth.—In the year 1871, said Wells, Fargo & Co., in the district court of the eleventh judicial district, in and for the county of El Dorado, State of California, instituted proceedings for foreclosure of said mortgage against said railroad company making said mortgage, and therein duly, and after proper proceedings, obtained an order for the sale of all the corporate property of the said Placerville and Sacramento Valley Railroad Company; which said decree was thereafter duly executed by the sale of said corporate property of said railroad company to one William Alvord; and thereafter the commissioner appointed by the court to make said sale did, by his deed, bearing date July 21, 1871, convey to William Alvord the said Placerville and Sacramento Valley Railroad, with its appurtenances. After Alvord had in this way acquired the title to the said railroad and its appurtenances, Leland Stanford, Mark Hopkins, and C. P. Huntington purchased of the said William Alvord all his right, title, and interest to the said railroad and its appurtenances, and received his proper deed therefor, for a good and valuable consideration, to wit, the sum of $166,400, in gold coin of the United States; and thereupon, and under said conveyance, said Stanford, Hopkins and Huntington entered into

possession of the said railroad of the said Placerville and Sacramento Valley Railroad Company, commencing at the town of Folsom, in Sacramento county, and extending to the town of Shingle Springs, in El Dorado county, by way of Latrobe, a distance of twenty-six and one-half miles. Since the time that Stanford, Huntington and Hopkins entered into possession of the property last above mentioned, the Placerville and Sacramento Valley Railroad Company has transacted no business and had no property. Thereafter, and in or about the year 1877, the said Stanford, Hopkins and Huntington duly sold and conveyed to the Sacramento and Placerville Railroad Company (the same being the fruit of the consolidation of the Folsom and Placerville Company and the Sacramento Valley Railroad Company), all and singular the interest acquired by them aforesaid in the property purchased by them of William Alvord, as hereinabove stated. The Sacramento and Placerville Railroad Company has never, at any time, taken any corporate action of any description in relation to Exhibit A ; and from the time of the purchase of the said property from the said Stanford, Hopkins and Huntington, and until the order of this court placed the same in the possession of Louis McLane as receiver and trustee *pendente lite,* the said property was in the possession of the said Sacramento and Placerville Railroad Company, was operated by it as part of its railroad between the city of Sacramento, Sacramento county, and Shingle Springs, El Dorado county, under its corporate name and for its corporate benefit.

"Eleventh.—The Placerville and Sacramento Valley Railroad Company never, at any time, had or owned any rolling stock or other equipments for its railroad."

It thus appears that the mortgagor company never had any rolling stock. The road laid with the iron purchased with the bonds of the mortgagor, some of which are involved in this action, was operated at the time this action was commenced by the defendant, Sacramento and Placerville Company. The rolling stock used was owned by this corporation. This corporation and the other corporations above mentioned, and the individuals Stanford, Hopkins, and Huntington claiming under it, were all purchasers of the road of the mortgagor, with full

notice of the mortgage securing the bonds owned and held by Kittle. . The mortgagor defendant having no rolling stock, and, as is apparent, the defendant Sacramento and Placerville Railroad Company having withdrawn its rolling stock from the road, the receiver and trustee could not operate the line without making some arrangements by which rolling stock could be procured. Nothing appearing to the contrary, we must presume that every effort had been made by the receiver to procure such stock before the purchase was made, and this purchase, when it was made, was authorized by the court below. The receiver being authorized by the stipulations of the mortgage to take possession and operate the road, he certainly was entitled to use all necessary and proper means to enable him to do so. And we cannot, under these circumstances, conclude that the court below went astray, in allowing the purchase of rolling stock. On this point, what was said by the Supreme Court of Alabama, in *Meyer* v. *Johnston*, 53 Ala. 348, per Manning, J., is to the point:

" But these properties " (the court is speaking of railroad property), " with their appurtenances, vast in extent and value, yet very perishable if unused and neglected, existing as the estates of private individuals associated into corporations, but essentially public works, in whose operations the public at large and the state are concerned, when drawn into litigation, must be dealt with by the courts according to the nature and circumstances of the subject. And any one can understand that the best and cheapest mode of conserving a railroad may be by operating trains thereon, and keeping it in repair for their use. To preserve its value, it must generally be continued in operation, and be sold as a going concern. If it were not for the public quality belonging to them, for the injury that would be done to the interests of whole communities, that have become dependent on a railroad for accommodation in a thousand things, a chancellor might say to the parties most interested: Unless you furnish means for the protection of this property, which does not of itself afford an adequate income for the purpose, it may become a dilapidated and useless wreck. But the inconvenience and loss which this would inflict on the population of large districts, coupled with the benefit of parties who, perhaps,

are powerless to take care of themselves, of preventing the rapid diminution of value, and derangement and disorganization that would otherwise result, seem to require, not for the completion of an unfinished work, or the improvement beyond what is necessary for its preservation of an existing one, but to keep it up, to conserve it as a railroad property. If the court had been obliged to take possession of it, that the court should borrow money for that purpose, if it cannot otherwise do so in sufficiently large sums, by causing negotiable certificates of indebtedness to be issued, constituting a first lien on the proceeds of the property, and redeemable when it is sold or disposed of by the court."

In *Stanton* v. *Ala. & Chatt. R. Co.*, 2 Woods, 586, in which a bill having been filed for the foreclosure and sale under a mortgage of the road and other property of the defendant railroad company, the court appointed receivers to take possession and control of the mortgaged property. Before the suit was begun, trains had been running on the road from one terminus to another; but a portion of the road had been built in a hasty and temporary manner, and needed to be completed in a substantial and permanent way, in order to insure the safety of trains. The court made an order authorizing the receiver " to put said railroad and the other property in repair, and to complete any uncompleted portions thereof; to procure rolling stock, machinery and other necessary things for operating the same, and to operate the same to the best advantage," and save and preserve the same for the benefit of the first mortgage bondholders and others having liens thereon. By the same order, the receivers were empowered to borrow or advance moneys, not exceeding $1,200,000, which were to be a first lien upon the mortgaged property prior to all others, and to be paid before the first mortgage bonds. They were also authorized to issue certificates for the money so raised for the purposes above mentioned, payable within a certain time, with interest payable semi-annually at a rate not exceeding 8 per cent. per annum. Other provisions were made as to the sale or disposition of the certificates, and directions were given as to their being countersigned by a majority of the trustees of the first mortgage bondholders. Under this order the receiver went into possession of

the road, managed it, and issued and disposed of nearly all the certificates authorized by the foregoing order.

In *Kennedy* v. *St. Paul & Pac. R. Co.*, 2 Dill. 448, where it was necessary to complete a road by a certain date, to secure a land grant which was a material part of the security to the bondholders, Dillon, Judge, authorized a receiver to borrow money and complete the road within the time limited. In this case, authority was given to the receiver to borrow not less than five millions of dollars. See also *Jerome* v. *McCarter*, 94 U. S. 734, where substantially the same thing was done to complete a canal, to secure a land grant.

We think the court did not err in the part of its decree above referred to. And as those expenses were incurred by the trustee and receiver under the direction of the court, in order to render the security effective under the mortgage to the bondholders, from whom no objection comes, we discover no error in the decree giving a lien for those costs and expenses prior to the lien of the bondholders.

The question as to the authority of the court to order a sale of the mortgaged property is also discussed, and it is contended that such portion of the decree is manifestly erroneous. The objection in this case does not come from the mortgagor defendant, but from one holding by purchase under a decree of foreclosure and sale of the property mortgaged, by a security subsequent and subordinate to the trust mortgage under which plaintiff has proceeded. The defendant mortgagor does not appeal, or object to the decree in any way.

It is said that the action is not brought for a sale of the mortgaged premises—that the mortgage does not provide for a sale on default in paying the interest for one year (the default on which this proceeding was instituted), and that the principal of the bonds has not as yet become due.

As to the first objection, the prayer of the complaint is broad enough to authorize a sale, if one should be necessary ; and further, if in the progress of the action events should occur which would authorize the court to order a sale, such order could be made on the application of any party whose interest calls for such action on the part of the court.

What is said of the terms of the mortgage is correct. No

sale is authorized on the default for interest, and the bonds have not yet matured. Still, is there not a necessity for a sale ? The mortgagor is insolvent, the other defendant purchaser of the road will do nothing to discharge the interest, and it appears if the road is operated at all by the trustee, it must be run at a loss. The trustee has no funds to repair the road with, and the road, if unused, must and will decay. The operation of the road must be at a loss. Nothing will be realized to pay the interest as it matures, or the bonds when their principal falls due, as the security is becoming less every day. It would seem from this that the only resort to secure anything for the bondholders is by a sale. The trustee having taken possession, is authorized to retain it until the interest and principal have been paid. ( *Wood* v. *Goodwin*, 49 Me. 260.) Under these circumstances, we think an urgent necessity has arisen for a sale ; such a necessity as will authorize a court of equity to order it. This was done in *Ford* v. *Crane*, 1 Hopkins' Chan. 120. This was a suit to adjust the rights of parties to a steamboat, and for an account. A person was appointed receiver of all moneys due or to become due from the earnings of the boat ; and under the direction of the receiver, the boat had been navigated for two years ; a petition was thereupon presented to the court on behalf of the complainants, stating that the receiver's accounts had been settled by a master ; that the boat was found to be in arrears to the receiver, and that she could not, under existing circumstances, be so employed as to be more profitable for the future than she had been for the past years ; that large disbursements would be necessary to fit her out for another season ; and praying that the boat might be sold. The application was argued by counsel for the parties, and the court made the order directing the sale. The report of the case states as follows :

"The court took time to consider the question, and the next morning said that this court must have a power to sell the subject of litigation, whenever such a sale becomes necessary to preserve the interest of the parties ; and that this must rest on the same foundation of general right as the like power in the maritime courts with respect to vessels.

"But in this case the vessel has sailed under the direction of a receiver for two years, and must be fitted out for another

season, or lie useless; and it is highly inconvenient and unfit that such operations should be conducted under the direction of this court for so long a time.

"Without entering, therefore, into the other questions discussed by the parties, the court thought this to be a case where it was indispensable to direct a sale."

So, in case of an *elegit* extended by a creditor on a moiety of the lands of the judgment debtor at law, the creditor must wait until he can be paid the amount of his judgment out of the rents and profits of the moiety extended. Where, however, the payment of the judgment cannot be attained at all by a mere application of the rents and profits (as where the interest on the judgment exceeds the annual rents and profits), or where the payment of the judgment cannot be had out of such rents and profits within a reasonable time, courts of equity will accelerate the payment by decreeing a sale of the moiety of the lands, "for," as is said by Judge Story (see 2 Story's Eq. Jur., § 1216 *a*), "it would be a gross injustice to the judgment creditor to compel him to wait for satisfaction of his debt out of the assets of his debtor for an unreasonable length of time, when he had a clear lien on the property for the full amount." (See *Staleman* v. *Ashdown*, Ambler, 13; S. C., 2 Atk. 477, 608; *Burton* v. *Smith*, 13 Pet. 464; *O'Gorman* v. *Comyn*, 2 Sch. & Lefr. 137, 150; *Tennent's Heirs* v. *Patton*, 6 Leigh, 196.) "For the same reason," says the same author just quoted, "courts of equity will accelerate payment by directing a sale, where the real estate bound by the judgment is a mere dry reversion; for in such a case there must, or at least there may, unavoidably be a long delay before the party can be paid out of the rents and profits." (2 Story's Eq. Jur., § 1216 *a*, and cases cited.)

We think the principle on which the cases above referred to are decided applies to the case before us, and that the court was authorized by the surrounding circumstances in ordering the sale. The parties with liens here should not be compelled to wait while the property, entirely unproductive, is going to destruction. It is for the interest of both parties that there should be a sale, and the matter determined. The fact that the defendant, who was operating the road, is able to continue to do so if allowed,

is of no weight on this point, when it is considered that it stands apart, and refuses to do anything to relieve the property bound by the lien and mortgage, of all the terms and conditions of which it had full knowledge when it became the purchaser. This conduct on the part of the defendant lends greater force to the circumstances authorizing and demanding a sale.

We wish to add here: The point is made by the appellant's counsel that John G. Kittle, the holder of the bonds in controversy, is not a *bona fide* holder thereof, because he took them after they were due. The counsel is mistaken in this assumption. The bonds are not due until 1894. They so appear on their face, and by the recitals of the mortgage. It is found by the court and admitted by the defendants (as stated in the bill of exceptions), that Kittle was a purchaser of these bonds in good faith and for their market value, but after some of the coupons on each of the bonds were past due and unpaid. He was then a *bona fide* holder.

Further, as far as concerns the only appellant, the Sacramento and Placerville R. Co., Kittle having purchased these bonds, which are valid, secured by a valid mortgage, we cannot see that the appellant can avail itself of such defense. However Kittle derived his title, it is good against the defendant.

We find no error in the record, and the judgment is affirmed.

McKINSTRY, J., SHARPSTEIN, J., MORRISON, C. J., and MYRICK, J., concurred.

Rehearing denied.