LONG ISLAND LOAN & TRUST CO. v. COLUMBUS, C. & I. C. RY. CO. et al.

(Circuit Court, D. Indiana.   January 28, 1895.)

No. 8,867.

RAILROAD BONDS—SALE BY PRESIDENT—INNOCENT PURCHASER.

Where negotiable railroad bonds perfect in form, payable to bearer, and certified by the trustee to evidence that they had become obligatory, are placed by the company in the hands of its president to sell or exchange for its benefit, they are valid in the hands of a purchaser in good faith before maturity, though they were disposed of by the president for his own benefit, after consolidation of the company with other companies, and though at the time of the purchase two of the semiannual interest coupons attached to each bond were past due.

Suit by the Long Island Loan & Trust Company against the Columbus, Chicago & Indiana Central Railway Company.

Kittredge, Wilby & Simmons, for complainant.

Lawrence Maxwell, Watson, Burr & Livesay, and S. O. Pickens, for defendants.

BAKER, District Judge.   On or about the 1st day of November, 1864, pursuant to a resolution of its board of directors, the Columbus & Indianapolis Central Railway Company made and authorized to be issued its certain series of bonds, numbered consecutively from 1 to 1,000, inclusive, for $1,000 each, payable on the 1st day of November, 1904, with 7 per cent. interest thereon, payable semiannually, evidenced by coupons annexed thereto.   All of these bonds were duly signed by its president, and attested by its secretary, and sealed with its corporate seal.   In the body of each bond was contained a provision in these words:

"This bond shall not become obligatory until it shall have been authenticated by a certificate annexed to it, duly signed by the trustee."

Each bond contains on its face, immediately below the signatures of the president and secretary, the following certificate:

"I hereby certify that this bond is one of the series of bonds described in and secured by the deed of trust or mortgage above mentioned.
   "[Signed]                                   A. Parkhurst, Trustee."

At the same time the railway company executed a trust deed or mortgage to secure the bonds to Archibald Parkhurst, trustee, which was duly recorded in each county in the states of Ohio and Indiana into or through which the railway ran.   On the 11th day of September, 1867, the Columbus & Indianapolis Central Railway Company was consolidated with other railroads, and became the Columbus & Indiana Central Railway Company.   On the 1st of February,

1868, the Columbus & Indiana Central Railway Company was consolidated with other railroads, and became the Columbus, Chicago & Indiana Central Railway Company. The Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company, one of the respondents, has become, by proper conveyances, possessed, by lease for a long term of years, of all the property, rights, and franchises of the Columbus, Chicago & Indiana Central Railway Company during such term. Benjamin E. Smith was the president of the Columbus & Indianapolis Central Railway Company from 1864 until, by consolidation, it became the Columbus & Indiana Central Railway Company, of which last-named company he became and remained president until by consolidation it became the Columbus, Chicago & Indiana Central Railway Company, and he became and remained the president of the last-named company until 1883. After the bonds had been completed, they were taken, shortly after their date, by Smith, president, and Moodie, secretary, of the company, to Philadelphia, and thence to New York, where they remained in the possession of Smith and Parkhurst. Smith and Parkhurst were authorized to sell these bonds, or to exchange them for bonds of a prior issue. Prior to 1870 (how long Mr. Parkhurst cannot remember) all the bonds not previously sold or exchanged went into the exclusive possession of Smith. In November or December, 1875, Smith borrowed for his own use, of a firm of brokers in Philadelphia, a considerable sum of money, executing his own notes therefor, and putting up 99 of these bonds as collateral security for his notes. Among the bonds so pledged were the 36 now held by the complainant. These bonds, it appears, had never been issued until so pledged by Smith. The complainant purchased the bonds in controversy in the open market for full value, before maturity, and he is an innocent purchaser for value, unless the fact that he knew that default had been made in the payment of the interest coupons falling due May 1, 1875, and November 1, 1875, impairs his right to be so regarded. These bonds, completed as perfect obligations, with the qualities of negotiable paper, payable to bearer, were at all times in the possession of Smith, Parkhurst, or Moodie, who had authority from the company to issue them when sold or exchanged for the use of the company. The bonds in question were actually issued in 1875, by Smith, for his own use, to the Philadelphia firm of brokers, and came by sale in the open market, in due course of business, into the complainant's hands.

Counsel for the respondents state the question for decision thus:

"When a party executes a negotiable instrument, complete in form, and retains it with the intention of future use and delivery, but before such use or delivery, and without any present intention to deliver it for any purpose, it is gotten from his possession by force, crime, or fraud, and passes into the hands of an innocent purchaser before due, is the maker estopped as against the innocent purchaser from denying its validity?"

The question thus stated is elaborately argued, with the citation of many authorities, to show that the bona fide holder of such negotiable paper would not be entitled to protection. It is unnecessary to consider the question thus stated, because it does not state the

question for decision with accuracy. The true question for decision is this: When a railroad company has made its negotiable bonds, perfect in form, payable to bearer, and has caused them to be certified by the trustee, to evidence that they have become obligatory, and has placed them in the possession of its president, with authority to sell or exchange them for the benefit of the company alone, can it defeat the title of an innocent purchaser for value and before maturity by averring and proving that its president has fraudulently pledged or sold such negotiable bonds for his own private use, without its knowledge or consent, after such railroad company had become consolidated with other railroad companies? And does the fact that such negotiable bonds have two unpaid interest coupons past due annexed to each bond impair the transferee's right to be deemed a bona fide purchaser?

A purchaser of negotiable railroad bonds in good faith and for their full market value may be a bona fide holder, although some of the interest coupons attached thereto are past due and unpaid at the time of purchase. Morgan v. U. S., 113 U. S. 476, 5 Sup. Ct. 588; Thompson v. Perrine, 106 U. S. 589, 1 Sup. Ct. 564, 568; Railroad Co. v. Sprague, 103 U. S. 756; Cromwell v. County of Sac, 96 U. S. 51; Bank v. Kirby, 108 Mass. 497; McLane v. Railroad Co., 66 Cal. 606, 6 Pac. 748; State v. Cobb, 64 Ala. 127; Boss v. Hewitt, 15 Wis. 260.

In Bank v. Kirby, 108 Mass. 497, 501, the court say:

"We are referred to no case in which it has been held that failure to pay interest, standing alone, is to be regarded sufficient in law to throw such discredit upon the principal security upon which it is due as to subject the holder to the full extent of the security to antecedent equities."

"To hold otherwise," the supreme court said in Cromwell v. County of Sac, 96 U. S. 51, 58, "would throw discredit upon a large class of securities issued by municipal and private corporations, having years to run, with interest payable annually or semiannually."

The doctrine was reaffirmed in Railroad Co. v. Sprague, 103 U. S. 756, and in Morgan v. U. S., 113 U. S. 476, 5 Sup. Ct. 588.

But, where it appears that the interest on the bond is overdue and unpaid, this is held in some cases, and I think erroneously, to be a circumstance of suspicion sufficient to put a purchaser on his guard, and to impair his title. First Nat. Bank of St. Paul v. Commissioners of Scott Co., 14 Minn. 77 (Gil. 59); Parsons v. Jackson, 99 U. S. 434; Morton v. Railroad Co., 79 Ala. 590. The better doctrine, however, seems to be that suspicion of defect of title, or the knowledge of circumstances which would excite suspicion in the mind of a prudent man, or gross negligence on the part of the buyer, will not affect his title. Nothing short of bad faith on the part of the purchaser of negotiable bonds passing by delivery, and which are fair upon their face, will destroy their validity; and the burden of proof lies upon the person who assails the title of the party in possession. Murray v. Lardner, 2 Wall. 110; Railroad Co. v. Lewis, 33 Pa. St. 33; Railroad Co. v. Cowdrey, 11 Wall. 459; Spence v. Railroad Co., 79 Ala. 576; Goodman v. Simonds, 20 How. 343.

The fact that two interest coupons attached to each of the bonds

were past due and unpaid at the time of his purchase, standing alone, does not impair the complainant's right to be deemed a bona fide purchaser of the bonds, and entitled to protection as such. Anon., 1 Salk. 126, was a cause where a bank bill payable to A., or bearer, had been lost, and was found by a stranger, who paid it to C., for a valuable consideration. It was held by Holt, C. J., that A. could not maintain trover against C., "by reason of the course of trade, which creates a property in the assignee or bearer." Since the decision of Lord Mansfield in Miller v. Race, 1 Burrows, 452, there has been no serious dissent from the doctrine that the want of delivery of bank notes and other paper intended to circulate as money is not available against a bona fide holder for value, who has taken the same in due course of trade. Worcester Co. Bank v. Dorchester & M. Bank, 10 Cush. 488. If a perfected bank note were stolen from the vaults of a bank before it was issued, and it should be passed by the thief in due course of trade, for value, to a bona fide holder, the latter would acquire a good title as against its true owner. In respect of negotiable promissory notes, perfect in form, it has been held in some cases that the want of delivery by the maker will not be available to defeat the title of a bona fide purchaser for value and before maturity. Kinyon v. Wohlford, 17 Minn. 239 (Gil. 215); Shipley v. Carroll, 45 Ill. 285; Clarke v. Johnson, 54 Ill. 296; Gould v. Segee, 5 Duer, 260. In this country, however, the entire absence of delivery of negotiable notes and bills has been regarded, in a majority of the cases, as a sufficient defense even against a bona fide holder, unless the maker has executed an instrument perfect in form, and has been guilty of negligence in letting it go out of his possession, and thereby given an opportunity to negotiate it to an innocent purchaser. Burson v. Huntington, 21 Mich. 415; Hall v. Wilson, 16 Barb. 548; Chipman v. Tucker, 38 Wis. 43; Carter v. McClintock, 29 Mo. 464. In England there are no decisions which have come under my notice necessarily determining the question. Some of the dicta affirm that delivery is indispensable (Marston v. Allen, 8 Mees. & W. 504; Baxendale v. Bennett, 3 Q. B. Div. 525); while others deny that the want of delivery by the maker will avail to defeat the title of a bona fide purchaser for value before maturity (Ingham v. Primrose, 7 C. B. [N. S.] 82, 5 Jur. [N. S.] 710; Young v. Grote, 4 Bing. 253).

It is generally agreed that the delivery of negotiable paper left in escrow, contrary to the terms upon which it was to have been delivered, will pass a good title to the bona fide transferee for value and before maturity. Fearing v. Clark, 16 Gray, 74; Graff v. Logue, 61 Iowa, 704, 17 N. W. 171. In a note to Willard v. Nelson (Neb.) 53 N. W. 572, the editor, after reviewing many authorities, says:

"We think the better rule is that he who signs a writing knowing that it is intended to be used, or may be used, for some business purpose, must at his peril ascertain that it is not a negotiable instrument, and, failing to do this, is liable absolutely, though he was procured to sign it by some fraudulent device or misrepresentation, or, having signed it advisedly, it was taken from his possession by fraud or theft, and without any intention on his part to deliver it to any one, or to let it be negotiated for his benefit or otherwise."

Negotiable railroad bonds, payable to bearer, are intended to pass from hand to hand in all the money markets of the world. It is the understanding of the commercial world that the purchaser of such bonds may safely rely on the title evidenced by possession as the true title, and that, in the absence of fraud or negligence so gross as to justify the inference of fraud, the title of a bona fide purchaser for value before maturity is unassailable. Any other understanding would cast suspicion upon such bonds, and impair, if it did not defeat, the purpose of their issue. And so it has been said that a purchaser of negotiable bonds before maturity, in the usual course of business, acquires a good title thereto, although they may have been stolen; and in a suit by the purchaser of such the burden of proof that he did not acquire them in good faith is upon the defendant. Evertson v. Bank, 66 N. Y. 14; Spooner v. Holmes, 102 Mass. 503; Seybel v. Bank, 2 Daly, 383, 54 N. Y. 288; California v. Wells, Fargo & Co., 15 Cal. 336; Association v. Avegno, 28 La. Ann. 552; Carpenter v. Rommel, 5 Phila. 34; Gilbough v. Railroad Co., 1 Hughes, 410, Fed. Cas. No. 5,419; Miller v. Race, supra. Such negotiable bonds, in a certain sense, are the representatives of money, and freely pass by delivery in the money markets of all commercial countries. To accomplish this purpose, the holder of a perfected bond must be deemed to be the true owner, and be able to invest an innocent purchaser for value and before maturity with an unimpeachable title. The title of a bona fide holder of such bond ought to stand on as secure a foundation as that of a person who receives a bank note in the ordinary course of business. Any other doctrine would, in my judgment, undermine the very structure of commercial law, and shake the foundations of such paper credits.

Each bond bears on its face the statement: "This bond shall not become obligatory until it shall have been authenticated by a certificate annexed to it, duly signed by the trustee." And each bond contains the certificate of the trustee that the bond is one of the series of bonds described in and secured by the trust deed or mortgage. The bonds could in no event become obligatory until the certificate of the trustee was annexed to them. This act of the trustee, when performed, was to authenticate the bonds; that is, "to determine as real and true" each bond so authenticated. When thus authenticated, its effect was to render them obligatory, and to pronounce them the genuine and valid bonds of the obligor. A bona fide purchaser, in the usual course of business, could safely rely on the declaration in the bond that, when authenticated by the certificate of the trustee, it should then become obligatory. The bonds in suit were properly authenticated by the trustee on or about November 1, 1864. From that time they became the binding and valid obligations of the maker in the hands of any bona fide purchaser for value and before maturity. The maker of the bonds and those acquiring the property conveyed by the trust deed to secure their payment are estopped to deny their validity in the hands of such innocent holder for value. The respondents are chargeable with negligence in failing to require the surrender of all unissued bonds before consenting to take the property with an incumbrance

upon it securing negotiable bonds which might pass into the hands of innocent purchasers unless they were canceled and destroyed. Both of the respondent companies had it in their power to require the production and cancellation of these bonds before they had acquired any interest in the incumbered estate. This they failed and neglected to do. They confided in the honesty of the officers intrusted with the custody of the bonds to make no fraudulent use of them. Their trust has been abused, and the familiar principle applies that "he who trusts most shall suffer most." In my opinion, the respondents have failed to make out any defense which would justify the court in denying the complainant the relief sought by its bill. There will be a decree for complainant.