CHARLES E. SKINNER, as Trustee, etc., Appellant, *v.* WARREN B. SMITH et al., Respondents.

Stockholders of a private corporation may be denied equitable relief against acts of the corporation which do not affect the public, but only the interests of its stockholders, and which, although *ultra vires*, are not *per se* illegal or *malum prohibitum*, where the stockholders asking for relief, have assented to those acts, or have acquiesced therein with full knowledge of the facts.

A manufacturing corporation may discontinue its operations, when unprofitable, for the purpose of protecting its shareholders from further loss.

In an action by a trustee of a manufacturing corporation to set aside certain transfers of its property alleged to have been made or authorized by the trustees as such to themselves individually and for an accounting, the following facts appeared: Said corporation was organized for the purpose of manufacturing carpets by machinery covered by certain letters patent, and issuing licenses for the use of the invention; its capital stock was $40,000, which was issued to defendants, the owners of the letters patent, as the consideration for the assignment by them of the said letters to the corporation. The actual value of the patent was much more than the sum specified, and the transfer was made without regard to its value, as a convenient mode of holding title and for the exclusive benefit of said owners, who, as sole stockholders and trustees of the corporation, carried on the business of issuing licenses to use the invention and collecting royalties. Subsequently concluding to go into the business of manufacturing, the defendants, as trustees, transferred back to themselves the letters patent, they surrendering the stock so issued. The stock of the corporation was increased to $600,000, all of which was issued to defendants, they paying therefor $250,000 in cash, and for the residue granting to the corporation a license to manufacture under the patent, on payment of a specified royalty. The court found this transaction was in good faith and with no intent to defraud any future holder of the stock, and that $350,000 of stock was not an inadequate consideration for the license. Defendants thereafter assigned to plaintiff and another $100,000 of the stock, as the consideration of their assignment to the corporation of certain other letters patent. The assignees were informed of all the facts relating to the re-transfer to defendants and the consideration for the issuing to them of the increased stock. Stock was also sold to another person who had knowledge of the facts. Plaintiff was elected a trustee. The corporation erected manufactories and carried on the business for a time, which resulted in a loss. Defendants and another, composing a majority of the board of trustees, as

such, adopted a resolution to sell the stock on hand, lease the manufacturies, and to secure defendants for advances made by them by mortgage on the property of the corporation, which was executed with the assent of two-thirds of the stockholders. Defendants were the only creditors of the. corporation, and the court found said resolution was adopted in good faith without intent to injure, and that it did not affect plaintiff, and was for the best interests of the corporation and its stockholders. The mortgage was thereafter foreclosed and the property bid in by one of the defendants. *Held,* that the complaint was properly dismissed.

Reported below, 56 Hun, 437.

(Argued April 28, 1892; decided October 1, 1892.)

APPEAL from judgment of the General Term of the Supreme Court in the second judicial department, entered upon an order made May 12, 1890, which affirmed a judgment in favor of defendants entered upon a decision of the court on trial at Special Term.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Theron G. Strong* for appellant.

*Joseph H. Choate* and *Theodore Fitch* for respondents.

FOLLETT, Ch. J. This action was brought by a trustee of the Smith Moquette Loom Company, pursuant to sections 1781, 1782 of the Code of Civil Procedure (which authorize actions against the officers of corporations, but not against corporations), to set aside alienations of property made or authorized by the individual defendants, to themselves, who were at the time a majority of the trustees of the corporation, and also to compel them to account for all sums and property received under such alienations.

Before considering the facts of this case, it will be well to bring to mind and state one or two of the well settled general rules of law applicable to actions of this class.

A contract entered into by a corporation by the authority or direction of its trustees, with themselves, and for their bene-

fit, or a transfer of its property by the authority of the trustees to themselves, may be set aside, in case it injures any public interest, or the private interest of any shareholder or creditor, even though the contract or transfer was executed in good faith · by the trustees. (*Duncomb* v. *N. Y. H. & N. R. R. Co.*, 84 N. Y. 190.) But this rule is not broad enough to condemn as void on the ground of public policy all contracts and transfers executed by a purely private business corporation, with or to its trustees, in good faith, in case no public or private interest is harmed thereby. Such contracts are not void but voidable at the election of those who are affected by the fraud. (*Twin-Lick Oil Company* v. *Marbury*, 91 U. S. 587–589; *Thomas* v. *Brownville, etc., R. R. Co.*, 109 id. 522–524; *Risley* v. *Indianapolis, B. & W. R. R. Co.*, 62 N. Y. 240; *Barnes* v. *Brown*, 80 id. 527–536; *Munson* v. *S. G. & C. R. R. Co.*, 103 id. 58–73; *Barr* v. *N. Y., L. E. & W. R. R. Co.*, 125 id. 263–277.)

Whether an action against trustees to prevent them from violating a public duty or to redress a public wrong can be maintained by any party other than " by the attorney-general in behalf of the people of the state," need not now be determined, for this action is not for the prevention or redress of a public wrong, but for damages for the violation of private rights. The public wrongs mentioned in the third and fourth subdivisions of section 1781, can be prevented or redressed only by an action brought in behalf of the people. (Code C. P. § 1782.)

What private interest was injured or imperiled by the transfer of the patent from the corporation to the individual defendants? Creditors were not injured by the acts complained of, for there were none, so far as the record shows, between the time when the corporation was organized and the date when this action was begun, except as the individual defendants became such by reason of advances made. The only private rights or interests alleged to have been impaired or jeopardized are those of shareholders. Who were the shareholders, and when and how did they become such?

January 16, 1877, letters patent numbered 186,374 were issued by the United States to Alexander Smith, for an improvement in carpet looms, which were assigned on December 12, 1878, by his executors to the following named persons, and in the following proportions: One-half to Warren B. Smith, one-fourth to William F. Cochran, and one-fourth to Eva S. Cochran; which assignments were duly recorded in the United States patent office December 14, 1878. Warren B. Smith and Eva S. Cochran are brother and sister, the children of Alexander Smith, and William F. Cochran is the husband of said Eva S. Cochran.

December 13, 1878, the Smith Moquette Loom Company was incorporated pursuant to chapter 40 of the Laws of 1848, and the acts amendatory thereof and supplementary thereto, with a capital stock of $40,000, divided into one hundred shares of the par value of $100 each. The purpose of the formation of the corporation was stated in the certificate as follows: " That the objects for which the said company is formed are the manufacture and selling of carpets and trans-- acting of all business necessary for and incident to the manufacture and sale of carpets, and the development and introduction of the Smith moquette loom and other inventions relating to the manufacture of carpets, and the issuing licenses and collecting royalties for the use of such inventions."

December 24, 1878, said three assignees of said patent assigned their interests therein to the Smith Moquette Loom Company, in consideration of, and in payment for, the above mentioned shares of stock issued by that corporation to them. January 20, 1879, these assignments were duly recorded in the United States patent office. These assignments were subject to a license granted February 1, 1877, by the original patentee, Alexander Smith to Alexander Smith's Son's Carpet Company, by which that company acquired the right to use 100 looms upon the payment of twenty cents royalty for every yard of carpet made on them.

Upon the organization of the corporation Warren B. Smith, became the owner of two hundred shares of its stock, William

F. Cochran, and Eva S. Cochran, of one hundred shares each, which they continued to own until November 18, 1880, when the capital stock of the corporation was increased to $600,000.

The court found in respect to the transfer from the individual defendants to the corporation as follows:

"That the original transfer of the invention and patent by the individual defendants to the company for forty thousand dollars was made by them without any regard to its actual value, which was many times greater than the sum, and solely as a convenient mode of holding and enjoying title to the same and to the royalties to be derived therefrom for their exclusive benefit as the sole owners thereof."

"Eighth. That the said defendants, Warren B. Smith, William F. Cochran and Eva S. Cochran, being the sole stockholders and trustees of said company, carried on the business of said company, until the fall of 1880, upon the original plan, to wit, the collection of royalties under licenses issued under said patent, during which period a large amount of royalties was collected and divided between them, and that during such period no manufacturing was carried on by said company."

"Ninth. That in the fall of 1880 the demand for moquette carpets was large, and the future prospects of manufacturing were encouraging, and the said defendants concluded that it would be advantageous for them that said company should engage in such manufacturing business, and, as they were unwilling to part with the exclusive ownership of said patent and invention, that said patent should be transferred to themselves individually at the same nominal figure at which they had transferred it to the company, and that to enable the company to go into manufacturing, erect the necessary buildings, buy machinery, and to manufacture, its capital stock should be increased to six hundred thousand dollars, all of which should be issued to themselves, forty thousand for that amount of money to be paid by them for the re-transfer of the patent and in lieu of the four hundred shares originally issued to them, which were to be surrendered. Two hundred and ten thousand dollars of that amount to be paid in cash by them, and the

residue of three hundred and fifty thousand dollars for an unlimited license to use the patents upon payment of the same rate of royalty paid by the Alexander Smith & Sons' Carpet Company, viz., twenty cents per yard."

September 23, 1880, the corporation acquired the right to increase its capital stock to $600,000. That increase was effected as follows: The individual defendants paid $250,000 in cash for twenty-five hundred shares, and they granted to the corporation an unlimited license to manufacture under the patent for thirty-five hundred shares, and the payment of a royalty of twenty cents per yard, which made up the full amount of the capital stock. At this time no person had any interest in the corporation, or in the patent, except these individual defendants. From the date of the organization of the corporation to November 18, 1880, when the capital stock was increased, no business was transacted by it except the granting of licenses for the use of the patents, and collecting royalties for the same. Among other rights granted by the corporation was one on the 17th of April, 1879, to the Hartford Carpet Company, by which it acquired the right, in consideration of $62,000 to use sixty-two looms upon the payment of a royalty of twenty cents per yard for every yard manufactured on the looms.

In respect to the increase, the court found: "That at the time of the said re-transfer of said patent and invention, the value thereof had not materially changed, and that said re-transfer at the same price at which the same had been conveyed to the company, was made by the defendants without regard to its actual value, in good faith, in the belief that they had the legal right to cause said re-transfer to be made by said company on the terms on which it was made, without any design or intent to injure or defraud any person who might thereafter become the holder of any of the increased stock to be issued by the company, and that no such person, or any person, was injured or defrauded thereby."

"That the unlimited license to manufacture under said patent, upon payment of a royalty of twenty cents per yard, was necessary for the manufacturing business of said Smith

Moquette Loom Company, and was not an inadequate consideration for the amount of thirty-five hundred shares of its capital stock then issued therefor, to the said defendants, Warren B. Smith, William F. Cochran and Eva S. Cochran, according to their belief and expectation at that time as to the manufacturing possible to be done by said company, and the issue thereof for that consideration was made by them in good faith and with no intent to defraud said company, or any future holder of stock therein."

November 18, 1880, a certificate No. one for three thousand shares was issued to Smith. A certificate No. two for fifteen hundred shares was issued to William F. Cochran, and a certificate No. three for fifteen hundred shares to Eva S. Cochran. These shares they continued to hold until March 31, 1881, during which said period said three persons were the only trustees of the corporation.

At some time prior to March 31, 1881, Charles E. Skinner and Eugene Tymeson had received from the United States letters patent for improved machinery for the manufacture of tufted or pile fabrics, which were numbered, respectively, 233,290 and 233,291, and, as they claimed, had invented five other improvements in looms for weaving tufted fabrics, for which patents had not been obtained. On the 31st of March, 1881, Skinner and Tymeson agreed to assign to the Smith Moquette Loom Company, said patents already issued, and also such patents for improved looms as they should thereafter obtain, in consideration of one thousand shares of the stock of the corporation, which were on that day assigned to them, 500 to Skinner and 500 to Tymeson, Warren B. Smith assigning 500, and Mr. and Mrs. Cochran 250 each. Afterwards, Skinner and Tymeson made formal assignments of the patents granted to them.

The court found in respect to this purchase as follows:

*Twenty-fifth.* "That the said plaintiff and Tymeson, at and before the time they assigned said patents to said Moquette Loom Company, and took an assignment of said certificates of stock, had knowledge that said loom company did not own the

Smith Moquette Loom patent aforesaid, but had only a right or license to use the same upon payment of a royalty, and that said patent had been transferred to the original owners, to wit, said individual defendants."

*Twenty-sixth.* "That the negotiations for the purchase of said Tymeson and Skinner patents were conducted between the plaintiff and the defendant Smith, and that the said defendant informed the plaintiff, before the same were closed, that the Smith Moquette Loom patent had been reassigned to the owners, to wit, himself, Mr. and Mrs. Cochran ; that the capital stock had been increased to $600,000, and that it had all been issued to said defendants, who were to put in $250,000 in cash, and that the company was to have a license to manufacture upon a royalty of twenty cents a yard."

*Twenty-seventh.* "That no misrepresentations were made to said plaintiff or Tymeson to induce them to assign their patents or accept any stock."

September 16, 1881, the individual defendants sold one thousand shares of their stock to John Sloane, to whom certificates were issued therefor.

November 19, 1881, the number of trustees of the corporation was duly increased from three to six, and John Sloane, Halcyon Skinner and Frank T. Holder were then elected as such additional trustees. Since that date, said persons have continued to be trustees, except March 15, 1884, Charles E. Skinner was elected in the place of Halcyon Skinner, since which date he has continued to be a trustee.

It is very clear, we think, that under these facts as found, that is, knowledge on the part of the plaintiff, and of all the shareholders, that the original patent had been assigned to the individual defendants, and an unlimited license granted to the corporation to manufacture carpets for $350,000, payable in the shares of the corporation, that this plaintiff as a trustee has no cause of action in favor of himself or of any of the shareholders because neither he nor they have any grievance to redress.

The court further finds that the corporation went on and

erected manufactories and engaged in and continued in the business of manufacturing carpets until about February 1, 1883, at which time the individual defendants had advanced $384,627.40. There does not seem to have been any dispute about the validity of this indebtedness. It was found upon examination that the business was being done at a loss, and thereupon it was resolved by the trustees that the stock on hand should be sold, the manufactories leased, and the sum due to the individual defendants secured by mortgages upon the realty and personalty of the corporation. More than two-thirds of the shareholders consented to the execution of these mortgages, and they were executed accordingly.

Fifteen months afterwards, nothing having been paid upon the mortgages, they were foreclosed and the property covered by them purchased by Warren B. Smith. The court found in respect to stopping the manufacture of goods, the leasing of the property and the execution of the mortgages as follows:

*Thirty-third.* " That the said defendants and Mr. Sloane voted for said resolutions in good faith, believing that there was no other way to save the Moquette Company and its stockholders from further loss, and that the act and proceedings therein directed were for the best interests of said company and its stockholders, and such also was the fact, and the defendants in passing the said resolutions did not intend to injure or defraud the plaintiff as a stockholder of said company, and did not, in fact, injure or defraud him."

*Thirty-fourth.* " That said resolutions so adopted by the board of trustees were necessary and proper, and were for the best interest of said company and its stockholders, and no better or other arrangement to save said company and its stockholders from further loss was practicable."

It should have been stated that John Sloane testified that when he purchased his one thousand shares that the patent had been transferred by the corporation to Warren B. Smith, and William F. and Eva S. Cochran, which fact he then knew.

November 29, 1880, two hundred and fifty shares were in form transferred by Smith and the Cochrans to Frank T.

Holden, to enable him to become a trustee, but he never had any real interest in them. No persons other than these mentioned ever held any of the shares of the corporation.

As before stated, this action is not brought to redress a public wrong. There is no finding that the transfer of the patent from the corporation to the individual defendants and the issuance of $350,000 in stock for the license, were in contemplation of thereafter selling shares to the public or to this plaintiff, who as well as Tymeson, purchased with full knowledge of all the facts.

This case falls within the principle stated in *Kent* v. *Quicksilver Mining Co.* (78 N. Y. 159), where it was said: " In the application of the doctrine of *ultra vires*, it is to be borne in mind that it has two phases : one where the public is concerned ; one where the question is between the corporate body and the stockholders in it, or between it and its stockholders, and third parties dealing with it and through it with them. When the public is concerned to restrain a corporation within the limit of the power given to it by its charter, an assent by the stockholders to the use of unauthorized power by the corporate body will be of no avail. When it is a question of the right of a stockholder to restrain the corporate body within its express or incidental powers, the stockholder may in many cases be denied, on the ground of his express assent or his intelligent though tacit consent to the corporate action. If there be a departure from statutory direction, which is to be considered merely a breach of trust to be restrained by a stockholder, it is pertinent to consider what has been his conduct in regard thereto. A corporation may do acts which affect the public to its harm, inasmuch as they are *per se* illegal or are *malum prohibitum*. Then no assent of stockholders can validate them. It may do acts not thus illegal, though there is want of power to do them, which affect only the interest of the stockholders. They may be made good by the assent of the stockholders, so that strangers to the stockholders dealing in good faith with the corporation will be protected in a reliance upon those acts."

The right of a manufacturing corporation to discontinue its operations when they have become unprofitable, for the purpose of protecting shareholders from further loss does not admit, we think, of doubt. (*Treadwell* v. *Salisbury Mfg. Co.*, 7 Gray, 395; *Hancock* v. *Holbrook*, 9 Fed. Rep. 353; *Boston, etc., R. R. Co.* v. *N. Y., etc., R. R. Co.*, 13 R. I. 263; Morawetz Corp. §§ 413 *et seq.*, 1004; *Buford* v. *Keokuk L. Packet Co.*, 69 Mo. 611.)

The judgment should be affirmed, with costs.

All concur.

Judgment affirmed.