BUFFALO LOAN, T. & S. D. CO. v. MEDINA GAS & E. L. CO. et al.

(Supreme Court, Appellate Division, Fourth Department. December 16, 1896.)

1. CORPORATIONS—BOND ISSUES—VALIDITY.
    An issue of bonds by a corporation is not invalidated by the fact that the bonds were negotiated and the mortgage securing them delivered by the secretary, though the resolution to issue bonds expressly provided that these acts should be done by the president, where the secretary is the real manager of the business, and owns all the stock save two shares, and the president and other director are mere figureheads, who were given a share of stock each by the secretary to qualify them for their positions.

2. SAME—LOAN ON BONDS NOT PERSONAL.
    A loan on bonds of a corporation presented by an officer authorized to negotiate them does not become a personal loan to such officer where the lender takes his individual note and other collateral in addition to the bonds, since this cannot change the nature of the transaction.

3. SAME—LIABILITY ON BONDS.
    A corporation is liable for money advanced on its bonds to an officer authorized to receive the same, whether the money was ever applied to corporate purposes or not.

4. SAME—CONTESTING BONDS.
    A private corporation cannot contest the validity of bonds which were issued with the consent of all the stockholders.

5. SAME—BONDS—NO INTEREST ON COUPONS.
    Interest coupons do not bear interest while in the hands of the bond owners. Williamsburgh Sav. Bank v. Town of Solon, 32 N. E. 1058, 136 N. Y. 465, followed.

Appeal from judgment on report of referee.

Action by the Buffalo Loan, Trust & Safe-Deposit Company against the Medina Gas & Electric Light Company and the Holland Trust Company to foreclose a mortgage. From a judgment of foreclosure and sale, defendants appeal. Modified.

This action was brought to foreclose a mortgage executed by the Medina Gaslight Company to the plaintiff as trustee, under date of September 15, 1886, upon allegations that the mortgagor had defaulted in the payment of the interest upon 10 bonds, secured by the mortgage, which bonds, it is alleged, were the

property of the German-American Bank of Buffalo, at whose instance the action
was brought. The defendants, by their answer, deny the material allegations
of the complaint, and especially allege that none of the bonds was ever issued
or negotiated by said company, that the said bank never became the bona fide
owner or holder thereof, and that no indebtedness exists for which the mortgage
can stand as security. The principal and material facts are these: At the time
of the execution and delivery of the mortgage and of the bonds, Mr. Stranahan
was the owner of all the capital stock of the company, excepting two shares,
one of each of said shares being held by two other persons, named Dayton and
Robertson, who, with Stranahan, constituted the directors of the company. Rob-
ertson was the president, and Stranahan was the secretary. These shares were
given to them respectively by Stranahan, to qualify them as directors, as stated
by a witness for the defendants. It appears that the affairs of the company
were principally conducted by Mr. Curry, its superintendent, who took charge
of the gas works, collected all of the meter rents and other moneys owing to
the corporation, purchased all supplies, and disbursed all moneys necessary to
pay the obligations of the company. Stranahan was also engaged in other oper-
ations, including the management of the Tonawanda Gaslight Company and the
Genesee Hotel, at Buffalo, and rarely came to Medina, but left it to Curry to do
all that was necessary for the successful management of the business of the
Medina Company. At a meeting of the board of directors held on September 11,
1886, a resolution was adopted, to the effect that it had become necessary for
the company to borrow the sum of $10,000 for the purpose of defraying its exist-
ing indebtedness, and for its other lawful purposes; and that, for the purpose
of borrowing such money, it would execute and negotiate its 10 bonds, for the
sum of $1,000 each, payable in 20 years, with interest at the rate of 6 per cent.
per annum, payable semiannually; and that, to secure the payment of such
bonds, it would execute and deliver to the Buffalo Loan, Trust & Safe-Deposit
Company a mortgage upon all of its property. The resolution further provided
that the president should prepare the bonds and mortgage; that the secretary
should attest the same; and that the president should "make delivery of such
mortgage and negotiate the said bonds upon the best terms possible." This reso-
lution was set forth in extenso in the mortgage, which expressly provides that
the mortgagee named as trustee shall join in the mortgage and accept the trust
created by it, and that the bonds issued pursuant thereto shall be identified
by its signature to a certificate indorsed upon each of the bonds. The mortgage
was acknowledged by the president and secretary of the company on the 18th
day of September, 1886, and by the plaintiff trust company three days later.
It appears from the testimony of Mr. Clark, the secretary of the plaintiff, that
on the day he acknowledged the mortgage and signed the certificate upon the
back of the 10 bonds, Stranahan presented to him the bonds and mortgage, and
delivered the same to him; and at the same time the plaintiff advanced to Stran-
ahan, upon the security of the bonds, the sum of $6,000, and took therefor his
individual promissory note; and from time to time thereafter advanced certain
sums to him, retaining the bonds as collateral for such indebtedness. At the
same time, Stranahan repledged certain stock of the Tonawanda Gas Company,
which he had previously pledged for a prior loan. In December, 1890, the
amount of Stranahan's indebtedness to the plaintiff reached the sum of $14,650.
Some time in 1886, one Alport was injured by an explosion in the gas works,
and brought an action against the company, which resulted in a judgment.
Thereupon, at the request of Stranahan, the plaintiff brought an action in De-
cember, 1889, to foreclose this mortgage; but, a settlement with Alport, who
was made a party defendant in the foreclosure action, having been subsequently
reached, the action was duly discontinued. In December, 1890, Stranahan, who,
up to that time continued to be the owner of nearly all the capital stock of the
mortgagor company, stood indebted to the German-American Bank in the sum
of about $9,000. The bank commenced proceedings against him as a nonresi-
dent, by attachment, and levied upon Stranahan's equity in the 10 bonds in the
possession of the plaintiff, and also upon said Tonawanda Gas Company stock.
It appears that for some reason this attachment was withdrawn, and the action
discontinued. At the request of Stranahan, the German-American Bank paid
to the plaintiff the sum of $14,650,—that being the amount in which he was
indebted to the plaintiff for moneys advanced upon the 10 bonds in ques-

tion, and the said Tonawanda Gas Company stock; and the plaintiff turned over to the bank the said bonds and stock, and surrendered to it the dishonored notes of Stranahan. The total amount which thus became owing by him to the bank was $23,000. At the time the bank acquired these bonds, there were attached to each eight unpaid coupons, and so appeared when offered in evidence. Thereafter Stranahan, from time to time, made various payments to the bank on account of the claims which it held against him, and reduced his indebtedness to $15,000, for which amount he gave his note, dated March 31, 1891. This note recited that there were deposited, as collateral security for its payment, 305 shares of Tonawanda Gas Company stock. Prior to this time, and, it would seem, in the forepart of 1891, Stranahan transferred to Mr. Linley all of his stock in the mortgagor company, and notified the bank that Linley desired to obtain the $10,000 bonds. It was thereupon agreed between the bank, Stranahan, and Linley that Stranahan should give his notes to the bank, indorsed by Linley, for the sum of $10,000; that the bonds should be held as collateral to the notes; and upon payment of the same the said sum of $10,000 was to be applied upon Stranahan's indebtedness to the bank, and thereupon the bonds would be delivered to Linley. The notes were accordingly given, and various payments were made upon them, but not sufficient to satisfy all the notes and entitle Linley to the bonds. Subsequently, and in April, 1891, the mortgagor company was consolidated with the Medina Electric Company, under the name of the defendant company, which became the owner of the property covered by the mortgage. Mr. Curry testified that Linley owned all the stock in the mortgagor company, and gave him one share, so he could be made a director in the present corporation. After the consolidation was effected, a mortgage was executed to the defendant the Holland Trust Company, to secure the payment of certain bonds thereupon issued.

Argued before HARDIN, P. J., and FOLLETT, ADAMS, WARD, and GREEN, JJ.

Louis Marshall, for appellants.

Tracy C. Decker, for respondent.

GREEN, J. 1. Contention is made by appellants' counsel that, the mortgage in suit never having been personally delivered by Mr. Robertson, the president, and the bonds not having been negotiated by him, they never became binding obligations upon the mortgagor company; that the bonds never had a valid inception until they were negotiated in the manner provided by the resolution authorizing their execution; that the resolution required, as condition precedent to the creation of any liability, that the president should negotiate the bonds upon the best possible terms; that the president must have been named for a purpose,—i. e. the protection of the corporation,—so that the future as well as the present stockholders should derive some consideration or benefit therefrom; that the president was, therefore, prevented from negotiating the bonds "upon the best terms possible," or upon any terms, and the bonds were never put into circulation through the agency of the corporation, but were practically stolen by the secretary, Stranahan, who received the manual possession thereof from the trust company, after it had certified the same; that Stranahan was not authorized to negotiate the bonds at all, but Robertson alone was authorized. This contention is clearly untenable. Stranahan was practically the owner of the entire capital stock of the company; and, if we are to believe the testimony of Curry, the superintendent, the other two directors took no active part in the management or control of its business affairs

The strong inference from his testimony and from the circumstances of the case is that they were "figureheads," and nominal stockholders and directors, subject to the control of their creator, and the mere creatures of his will. Evidently it was a matter immaterial to them whether they should negotiate the bonds or the virtual owner of them and of the corporation itself should do so. They knew, or must have known, that Stranahan negotiated the bonds, and their acquiescence is evidenced by long lapse of time and circumstances presented. If they did not actually know that Stranahan had the mortgage recorded, and had disposed of the bonds, they did not care. It was none of their particular business, for they had but very little interest to protect. Stranahan and Curry managed the whole business. Robertson and Dayton could not presume to interfere and object to the acts of the owner of the company. During all these years Dayton and Robertson remained silent. Silence may give consent, and long acquiescence must, under such circumstances, be sufficient evidence of authority. This action has afforded them the opportunity to come forward and testify as to what they do not know in respect to the matters in controversy; but it appears that the defendants have not thought it advisable to produce any of the directors as witnesses to establish their defense. Surely, when the trust company brought the foreclosure suit in December, 1889, at the request of Stranahan, and for the purpose, it would seem, of cutting off Alport's judgment, these nominal directors must have known of the institution of that suit, and consequently the disposition of the bonds which three years before they had authorized to be issued and negotiated. Let it be assumed that it was incumbent upon the trust company to make inquiry of the other directors as to whether they would permit Stranahan to negotiate the bonds, or insist that the act be performed by the president, what would have been the answer? In view of all the circumstances and condition of things now disclosed, and particularly the peculiar relationship existing between the subordinate directors and their superior, could it reasonably be inferred or presumed that the holders of the 2 shares of stock would refuse to authorize the owner of 298 shares to negotiate the bonds? The general doctrine is that the purchaser of a negotiable instrument, who purchases under circumstances which throw upon him the duty of making inquiry as to its validity, assumes no greater risk by his failure to inquire than the burden of proving that the facts which he could have discovered, had he inquired, would have protected him. Wilson v. Railway Co., 120 N. Y. 145, 24 N. E. 384. "Therefore, if the plaintiff, when charged with the duty of making inquiry, had actually done so, whatever its officers prosecuting the investigation would naturally have discovered, according to any permissible inference from the evidence, it can now invoke to establish the implied authority of Mr. Stone. What could the jury have found in this regard within the rules governing their powers if the case had been submitted to them for decision?" Hanover Nat. Bank v. American Dock & Trust Co., 148 N. Y. 612, 622, 43 N. E. 72; Id., 75 Hun, 55, 26 N. Y. Supp. 1055. And see Cheever v. Railroad Co., 150 N. Y. 59, 44 N. E. 701. The conclusion is fully warranted by the

evidence that Stranahan was lawfully in possession of the bonds, and with ample authority to dispose of them.   The suggestion made that the president was designated in the resolution as the officer to negotiate the bonds, so that the "company" might be protected from the loss to be expected and anticipated if they should be intrusted to Stranahan, is, in the light of the evidence presented, very suggestive, but nothing more.   Whether or not the compliment is justly deserved, we are unable to say; nor is there much weight in the suggestion that the secretary practically stole the bonds of which he was the virtual owner.

2. It is argued with some show of reason that Stranahan never negotiated nor pledged the bonds for or on behalf of the company, but rather on his individual behalf and credit, and for his own individual purposes; that the moneys were advanced to and received by him, not while acting for the company, but while acting in his individual capacity, and for the accomplishment of his own private objects; and it is insisted that this contention is strengthened by the circumstance that there is no evidence that any of these moneys so received were ever used for, or applied to, the purpose of defraying the existing indebtedness of the company, or "for its other lawful purposes," or that the company ever received any advantage or benefit therefrom; but it is claimed that the evidence indicates the contrary.   The referee truly says that the trust company acted in a dual capacity.   As trustee for the bondholders, it had certain duties to perform; and as a banking corporation, it had the right to loan money upon securities; and it made no practical difference whether it was named as trustee in the security, except so far as it was chargeable with notice of any diversion of such securities.   If the plaintiff had never parted with these bonds, could it maintain this action in its own behalf, as a bona fide purchaser or pledgee of the bonds?   The referee says not; and the reasons given for his conclusions are that when the bonds and the mortgage were presented to plaintiff it was apparent that they had never been negotiated by the president, as required by the resolution recited in the mortgage; that the plaintiff had not at that time accepted the trust, and the resolution itself required that the bonds should be certified by the plaintiff; that the instruments were, therefore, both incomplete when presented, and the plaintiff was chargeable with knowledge that they had never been negotiated in accordance with the terms of the resolution; and there was no presumption and no evidence before plaintiff's officer that Stranahan had any authority to pledge them for his own individual debt; that the plaintiff, therefore, in its capacity of a banking corporation, was not a bona fide purchaser of the bonds, nor did it take any title to the same as against the mortgagor, for the transaction constituted a diversion of the bonds from the purposes for which they had been issued.   The answer to this reasoning is that Stranahan did, in fact, possess authority from his co-directors and stockholders—who, with himself, constituted the corporation, and owned all its assets—to negotiate the bonds; consequently, the matter must be judged as though the secretary, instead

42 N.Y.S.—50

of the president, were designated in the resolution for such purpose. If the co-directors had been asked whether Stranahan, who was the virtual owner of the bonds, was authorized to receive advances upon them, what would have been the answer? What could they have answered? During the period of four years the plaintiff held these bonds, and made further advances upon them, and no one interested in the company as stockholder ever questioned its title. That the nominal directors and stockholders must have known that Stranahan had disposed of the bonds and received the money, is clearly evident. They could not have been ignorant of the foreclosure suit in December, 1889. They knew the bonds and mortgage were outstanding and uncanceled. Perhaps, however, they knew nothing about it and cared less, as it was none of their concern. Stranahan was the corporation itself, and practically owned all its stock and property, and was, therefore, the very proper person to dispose of the bonds.

The case, then, is simply this: An officer of a corporation, with full power to raise money upon its negotiable bonds, presents them to a bank, and asks for a loan of money upon the strength of them. The bank complies, and also takes from him his individual note and other collateral; and the question is whether the moneys were advanced to him in his individual character or as a representative of the corporation. Because of the acceptance of his personal promissory note and other collateral, must the transaction necessarily be characterized as an individual loan? That the advances were made to some extent, and, it would seem, to a great extent, on the strength of the bonds and mortgage, is a very reasonable presumption. The taking of individual security cannot impair the legal effect or consequence of that transaction. See Long Island Loan & Trust Co. v. Columbus, C. & I. C. Ry. Co., 65 Fed. 455. Presumably, the taking of the note and the other collateral may have been induced by the consideration that the president was the person authorized by the resolution to negotiate the bonds; and the plaintiff may have entertained some doubts in respect to the validity of the transaction with the secretary, although being aware, no doubt, that he was the principal stockholder. Now, since the advances were made upon the faith and strength of the bonds and mortgage, and that Stranahan was authorized to receive the money for the company, payment to him was payment to the corporation itself. The corporation was then present at the time of the transaction, and received the moneys through its representative; and by means of the statement in its corporate obligations that the funds were desired for corporate purposes. In contemplation of law, therefore, the funds came into possession of the company; and, that being the case, the plaintiff was under no obligation to see to it that the moneys were applied to the purposes for which the obligations were issued, and, consequently, it is not responsible for their misapplication; and it is immaterial, therefore, what Stranahan did with the moneys, of which he was virtually the individual owner. Clearly, the referee's conclusion that the transaction amounted to a diversion of the securities is founded in error. "It was not sufficient to allege that the books of

the company did not show value received for the bonds, or that the president did not make a return of the proceeds to the company. The bonds were in such form as to pass by delivery. A purchaser had simply to pay his money and take his bond. He was not bound to see to the application of the money to the purposes of the corporation. He might presume that they had sufficiently provided for their own safety in that matter. The allegation is not that the bonds were obtained fraudulently, and without being paid for, nor that they were not in fact paid to the proper officer or officers of the company, but only that the books do not show what had become of the proceeds. This was clearly insufficient." Railroad Co. v. Lewis, 33 Pa. St. 33. And see Jones, Corp. Bonds, §§ 186, 201.

If it were a matter of any importance to determine whether the company received, directly or indirectly, any benefit from the moneys loaned, the question would arise, "Upon whom is the burden of proof?" The answer would be, "Upon the defendants." And that obligation they have not performed, by reason of their not calling a person who must be able to give material information on the subject. If there is information which might have been, but is not, forthcoming, and which might have been very material, who ought to have produced it upon this trial? The burden of producing it lies upon the parties who have to make out their case, and those parties, in this instance, are the defendants. The plaintiff has the legal title, and is entitled to keep it, unless it can be shown that there are equitable grounds upon which it should be deprived of it. In whatever position we might have been if better evidence could not have been produced, we must decline to draw inferences as to matters upon which evidence might have beeen brought before us. Bentinck v. Bank [1893] 2 Ch. 120, 136, 137. The testimony of Curry, the superintendent of the company, falls short of proving that the company could have received no benefit from the moneys. No excuse is shown why the directors or officers, and especially Stranahan, were not produced as witnesses. "All evidence is to be weighed according to the proof which it was in the power of one side to have produced and in the other side to have contradicted." See Kirby v. Tallmadge, 160 U. S. 379, 16 Sup. Ct. 349; McGuire v. Insurance Co., 7 App. Div. 575, 589, 591, 40 N. Y. Supp. 300. The finding of the referee that there is no evidence that any of the moneys advanced to Stranahan were ever applied to corporate purposes, is based on the erroneous assumption that he had no power to negotiate the bonds and receive the moneys on behalf of the company; that the transaction was a personal one, and the pledge amounted to a wrongful diversion of the bonds; and that, therefore, the burden was imposed upon the plaintiff to call Stranahan, and establish, if it could, the application of the moneys to the benefit of the company. The position taken by appellants appears to be that the company could not have received any benefit from the funds, because, forsooth, the superintendent of the company says they did not need them. And it is argued that in September, 1886, the company's plant was entirely paid for; that it was entirely out of debt, and was in receipt of an income from its customers which was entirely

sufficient to pay for all the improvements that were needed and that were contemplated. If that be true, then the resolution recited in the mortgage was a lie. Besides, as respondent's counsel has pointed out, the testimony of Curry shows that the income was insufficient for the necessities of the business. Conceding that the plaintiff was bound to have made inquiry as to whether the secretary was authorized to receive the moneys, as the result of the inquiry would have shown that he possessed such authority, the plaintiff would be protected in making the advances; and the fact that it made no inquiry will not place it in any different position than it would have occupied had inquiry been made. See Wilson v. Railroad Co., and Hanover Nat. Bank Case, supra.

In view of the fact that Stranahan was practically the owner of the entire capital stock, and the corporation was virtually his private property, and in the light of all the circumstances disclosed in respect to his transactions, the court must not carry too far the legal conception that a corporation is to be regarded as a legal entity, existing separate and apart from the natural persons composing it. "The statement that a corporation is an artificial person or entity, apart from its members, is merely a description in figurative language of a corporation viewed as a collective body. A corporation is really an association of persons, and no judicial dictum or legislative enactment can alter this fact." Mor. Priv. Corp. § 227. So that the idea that a corporation may be a separate entity, in the sense that it can act independently of the natural persons composing it, or abstain from acting where it is their will that it shall, has no foundation in reason or authority, and is contrary to the fact. State v. Standard Oil Co., 49 Ohio St. 137, 177, 30 N. E. 279; 1 Beach, Priv. Corp. § 1.

The further contention is made by appellants that, this action being prosecuted on behalf of the German-American Bank, the legal owner of the bonds, the further question for determination is whether the bank has acquired the title of a bona fide purchaser, though the trust company may not have stood in that position. We do not regard the question of the good faith of the holders of these bonds as of any account, so long as it appears that they took them for value, and paid for them in cash. The bonds in question were issued with the consent of all the stockholders at the time they were issued. Therefore neither the stockholders nor the corporation are in a position to contest their validity. This doctrine is held in Kent v. Mining Co., 78 N. Y. 159, and in Skinner v. Smith, 134 N. Y. 240, 31 N. E. 911, in respect to manufacturing corporations,—corporations which do not possess the right of eminent domain,—which have no duty to perform to the public. The corporation in this case is one of that kind. There is no evidence that the issue of these $10,000 of bonds would impair the power of this company to discharge its duty to the public. There is no member of the public who makes any objection, or seeks to have these bonds set aside, and no stockholder or creditor seeks to have them set aside, and as against everybody else the plaintiff has the absolute right to recover.

Further discussion of the questions presented here is unneces-

sary, as it appears to us that the decisions bearing upon these questions clearly sustain the right to enforce the payment of the bonds in question. In accordance with the decision in Williamsburgh Sav. Bank v. Town of Solon, 136 N. Y. 465, 32 N. E. 1058, the allowance of interest upon the coupons must be deducted. The amount of interest so allowed is the sum of $1,293.04. The judgment should be modified by deducting from the amount thereof the sum of $1,293.04, and, as so modified, the judgment should be affirmed, without costs in this court to either party.

Judgment modified by deducting therefrom $1,293.04, and, as so modified, affirmed, without costs to either party in this court. All concur.