(17 App. Div. 352.)

### MARBURY v. STONE et al.

(Supreme Court, Appellate Division, First Department.   May 7, 1897.)

CORPORATIONS—ACTION BY STOCKHOLDER—LACHES.

A stockholder is not entitled to equitable relief against the acts of the corporation where three years had elapsed since the acts complained of, and it was supposed at the time that all the stockholders had assented thereto, but stock had been assigned secretly to the stockholder in question and not transferred on the books.

Appeal from special term, New York county.

Action by Isabella S. Marbury, as administratrix of Andros B. Stone, deceased, against Georgiana C. Stone and John D. Wood, as executors of George F. Stone, deceased, and others. From a judgment dismissing the complaint, and confirming the acts and settling the accounts of George F. Stone as trustee, plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and RUMSEY, WILLIAMS, PATTERSON, and PARKER, JJ.

George C. Lay and Wm. H. Gibson, for appellant.
Alfred Jaretzki, for respondents.

WILLIAMS, J.   The action was brought by Andros B. Stone to set aside two trust agreements dated May 15 and May 16, 1888, and all conveyances, etc., made pursuant to these agreements, on the ground that they were illegal and void, and in violation of plaintiff's rights as a holder of stock of the Marvel Iron Company, Limited. In the spring of 1886 the defendant Marvel was engaged in an effort to float an enterprise for the opening up and working of certain iron mines in the province of Almeria, Spain, and for the transportation, shipping, and disposition of the ores when mined. These mines were located in the Alhamilla mountains, about 12 miles from Almeria, a small Mediterranean port on the coast of Spain, and the enterprise contemplated the building of a narrow-gauge railway from the mines to the port. Marvel represented that he was the absolute owner of these mines, and that he had a concession or charter from the government of Spain for the building of the railway; that the mines were very productive and rich; and that he had valuable rights on the mole or wharf at Almeria, at the terminus of the proposed railway. By his representations he interested in the enterprise George F. Stone, who at once contributed $100,000 in cash; Robert L. S. Hall, who contributed $25,000; and John C. McKenzie, who contributed $25,000. Edward N. Hill, who had formerly been Marvel's bookkeeper, also became connected with the enterprise, but contributed no capital. The plan was to build the railway from the mines to the port, and then work the mines, and sell and ship or otherwise dispose of the ores. It is difficult, from the evidence, to determine just how the plan was attempted to be worked out, as many of the papers executed by the parties are not in the record. Along in the latter part of April, 1886, a corporation was organized, under the laws of the state of New York, known as the Marvel Iron Company, Limited, with a capital of $1,000,000, composed of 10,000 shares of

stock of the par value of $100 per share, the purpose of which was the mining of ores, and the disposing of the same by sale or otherwise, and the erecting and operating of furnaces, steel works, and other works in Spain and in the United States. A partnership was also formed under the firm name of William D. Marvel & Co. for the purpose of the importation and sale of ores, metals, and other like articles of merchandise. Forty shares of the stock of the corporation were distributed among four persons, Hall, Stone, Hill, and one Francis (10 shares to each), to enable them to become directors; and the remaining 9,960 shares were issued to Marvel in consideration of a lease by him to the corporation for 49 years of the mines and the railway, when completed, which Marvel agreed should be ready for use on December 1, 1886. There appears also to have been an agreement between the corporation and Marvel, known as the "Commercial Contract," which provided that Marvel should have the sole charge, for the corporation, of the sale and shipment of the ores and other products of the mines, for a commission to be paid him. The co-partnership was composed of Marvel, Hall, and Hill, as general partners, and Stone, as a special partner; and while its purpose was to carry out the commercial contract between Marvel and the corporation, before referred to, which contract was assigned to the partnership for a limited term, it seems also to have been one of its purposes to furnish Marvel the moneys necessary to construct and complete the railway from the mines to the port. Marvel was to contribute the alleged good will of an established business and his services, and was to have 30 per cent. of the net profits; Hall was to contribute his services only, and was to have 25 per cent. of the net profits; Hill was to contribute his services only, and was to have 15 per cent. of the net profits; and Stone was to contribute $100,000, and was to have 30 per cent. of the net profits, and also 6 per cent. interest on his $100,000, or such part thereof as remained to his credit, from time to time. The moneys advanced by Stone, Hall, and McKenzie were paid into the co-partnership, and were placed to the credit of the Marvel construction account; and Marvel transferred to Stone 1,000 shares of the stock of the corporation, and to Hall and McKenzie each 250 shares of such stock. The moneys advanced by Hall and McKenzie were not regarded as contributed to the co-partnership, but the money advanced by Stone was regarded as the money advanced by him to the co-partnership. Why this distinction was made is not entirely clear from the evidence in the case. At the same time, Marvel transferred 6,000 shares of the stock of the corporation to Fry and Baldwin in trust to hold the same, and receive the dividends thereon, until such time as the trustees should be paid the sum of $255,000; and it was provided that, so often as the trustees should be paid any part of such amount, they should disburse the same in the proportion of $100,000 to the partnership, $100,000 to Stone, $25,000 to Hall, $25,000 to McKenzie, $2,500 to Fry, and $2,500 to Baldwin. Marvel transferred to the partnership 1,000 shares of the stock of the corporation, besides the stock transferred to Stone, Hall, and McKenzie; and this additional transfer of 6,000 shares to the trustees apparently was by way of additional security

for the moneys which had been advanced by the individuals and the partnership, and placed to the credit of the Marvel construction account, to be used by Marvel in constructing the railway. Powers of attorney were then given to Marvel by the corporation and the partnership to conduct their business affairs in Spain, and he went to Spain to construct the railway and carry on the business connected with the enterprise. He had on hand the $150,000 advanced by Hall, Stone, and McKenzie, and an agreement by the partnership to furnish any additional money necessary to the extent, apparently, of $100,000 further, for which amount he had transferred to the partnership the 1,000 shares of stock of the corporation.

Marvel proceeded with the construction of the railway, and at the same time mined or purchased and shipped some ore for the partnership, under the commercial contract with the corporation. He failed to complete the railway, as he had agreed, before December 1, 1886. He used up the $150,000 of cash on hand, and Stone from time to time advanced other moneys to the partnership, for the Marvel construction account, during the years 1886 and 1887, which Marvel used to the amount, in the aggregate, of $120,000. October 5, 1887, Marvel transferred to the partnership 1,500 additional shares of the stock of the corporation to secure these advances, for which advances the partnership gave Stone its notes, or had already given them, and which advances were, or had been, placed to the credit of the Marvel construction account. An agreement was at the time made between the co-partners, containing other provisions, which need not be referred to here. The operations in Spain continued under Marvel's directions until May, 1888. In November, 1887, Hall went out there to investigate the condition of the enterprise, and remained there until March, 1888. He found everything hopelessly involved, and, after making some effort to straighten things out, he returned to New York to report to the other parties interested. Marvel returned to New York about May 1, 1888. The parties thereupon consulted together as to the condition of the enterprise. There was dispute as to Marvel's title to the mines. There were adverse claims, and a suit had been brought by one party, claiming Marvel had procured a deed by fraud. The railway was in an incomplete condition, and there was trouble over rights of way. Part of the roadway that had been constructed had been washed away, and there were other troubles connected with the property in Spain. The partnership was largely in debt. It owed the Fourth National Bank of New York City $20,000, and it owed $15,000 on open account, besides its indebtedness to Stone of $120,000; and it had no resources, and Marvel had none. There was dissatisfaction as to Marvel's management. Under all these circumstances, the parties concluded to make the trust agreements complained of, and they were accordingly made May 15 and 16, 1888. It was supposed at the time that the only holders of the stock of the corporation were the partnership and the members thereof, and McKenzie and Francis. These were the only stockholders, so far as appeared from the books of the corporation. Marvel seemed to be the holder of 60 shares of stock. All these people were parties to and executed the trust agreements, in-

cluding the corporation and the partnership in their respective names, and there is no doubt as to the authorization of the execution by the directors of the corporation and the members of the partnership. These agreements together provided, in substance, that the lease of the mines by Marvel to the corporation, and the so-called "commercial contract" between Marvel and the corporation, and a railway transportation contract between Marvel and the corporation, with the lease of the railway therein referred to, and all other leases and powers between Marvel and the corporation, and between the partnership and the corporation, and between Marvel and the partnership, be wholly annulled and rescinded; that Marvel convey the mines so leased, and an additional mine held by him absolutely, to the corporation, in fee; that Marvel convey the railway concession, with the railway and the lands and other property appurtenant thereto, including the mole property, to Stone, to be by him conveyed to a railroad corporation to be organized by him, upon such capitalization, conditions, and powers as he might deem best, he to receive therefor the entire capital stock of such company; that the trust agreement as to the 6,000 shares of stock between Marvel, Fry, and Baldwin, be wholly dissolved and annulled, and the stock delivered to Stone; that Stone hold the concession, railway property, etc., and the capital stock of the new railroad corporation, and the 6,000 shares of stock received from Fry and Baldwin, in trust, with full power to manage, sell, and realize thereon in such manner and upon such terms as he might deem best; that the holders of the capital stock of the Marvel Iron Company, Limited, assign, transfer, and deliver over their respective holdings to Stone upon demand, in trust, for sale or such other disposition as he, in his absolute discretion and judgment, might deem for the best interests of all concerned, he being fully authorized and empowered to sell this stock, or join therewith in the reorganization of the company, or realize upon the stock, in such manner and upon such terms and conditions as he, in his absolute discretion, might deem best; and the proceeds of all this property so transferred to, and held in trust by, Stone, to be used and applied: First. To defray the expenses of the trust, including all expenses of negotiating, carrying, arranging sale or transfer of such properties, counsel fees, traveling expenses, and agents' commissions, etc. Second. To reimburse Stone for moneys loaned to or expended for the account of the partnership or corporation, with interest. Third. To reimburse Stone, Hall, and McKenzie for all money, with interest, laid out or expended in the purchase of the stock of the corporation, and, after paying all the foregoing in full, to dispose of the remainder as follows: (1) $100,000 to Marvel; (2) the balance to persons who are stockholders of record of the corporation, in the proportion that their holdings bear to the whole amount of such capital stock.

It will be seen that the scheme of these agreements was to put the absolute title to the mines in the corporation, and to place the absolute title and control of the railroad and the stock of the corporation in the hands of Stone, to dispose of under the terms of the agreements, and to realize moneys to be applied and distributed under

the agreements. The existence, organization, and management of the corporation were in no way interfered with. It had never personally done any business, and was to do none. The whole enterprise had been unsuccessful, and was likely to prove a complete failure, and result in a total loss of all the moneys that had been put into it, unless its management was changed and something was done to save it. Marvel apparently could not bring the enterprise into any favorable condition. The parties came together and negotiated this scheme, and, when these trust agreements were made, it was supposed that all parties interested in the enterprise were parties thereto. Marvel, however, secretly transferred to his wife 30 of his 60 shares of stock, apparently for the purpose of having a further opportunity to make trouble if he should feel so inclined. The evidence given on the trial of this case showed, and the referee found, that:

"On or about the 2d day of May, 1888, the defendant Marvel indorsed and delivered to his wife, Sarah E. Marvel, as a gift, a certificate for thirty shares of stock of the Marvel Iron Company, Limited. That the said stock was not transferred on the books of the said company until long after the agreements of May 15 and May 16, 1888, set forth in the complaint, were executed, and Sarah E. Marvel did not become a stockholder of record of said company until about February 17, 1893. The plaintiff was not the owner or holder of any of the stock of the said Marvel Iron Company, Limited, on the 15th and 16th days of May, 1888, when the two agreements above set forth were executed; but on or about the 17th day of February, 1893, he became the owner and holder of a certificate for ten shares of the said stock, which ten shares had been transferred to him by the said Sarah E. Marvel without consideration, and on the request or at the suggestion of the defendant William D. Marvel, and which were a part of the thirty shares referred to in the preceding * * * finding."

The referee dismissed the complaint, upon motion made by the respondents, on the ground that the plaintiff had failed to establish any cause of action; had failed to show that the two trust agreements were, or that either of them was, illegal or void; and on the ground that the same were, and each of them was, in all respects legal and valid. The first questions arising on this appeal relate to this part of the referee's decision. It may be suggested at the commencement of the consideration of this branch of the case that this action was made to rest solely upon the proposition that these trust agreements were illegal and void. It was not alleged or claimed on the trial that any of the parties acted in bad faith, or were guilty of actual fraud, or that the plaintiff or his assignor, the wife of Marvel, had been or was in any manner injured or prejudiced by the agreements sought to be set aside. We are unable to see how, in the absence of fraud, any of the parties to these agreements can be heard to allege that the agreements were illegal or void. The agreements were clearly such as all the parties interested might make, and it seems to us the only persons, if any, who could attack the agreements as illegal or void, were those who had an interest in the enterprise, and who were not parties to the agreement. The plaintiff claimed to occupy such position by virtue of the stock which he received from Marvel's wife, and which she owned at the time the agreements were entered into. The plaintiff, as the owner of such stock, had no greater rights than were

possessed by Mrs. Marvel at the time she transferred the stock to the plaintiff. The transfer by her was subject to all equities between her and the parties to this agreement, and such persons as acquired rights under the agreements. Mrs. Marvel, having received the 30 shares of stock from her husband, May 2, 1888, held the whole of it until June 8, 1891, when she transferred five shares of it to the plaintiff and five shares to Attorney Porter; and March 7, 1892, Porter transferred his five shares to the plaintiff, who then had ten shares. The corporation refused to transfer this stock to the plaintiff on the books of the corporation, and he brought an action to compel the transfer, which resulted in a judgment, entered February 11, 1893, directing such transfer, and the transfer was actually made February 17, 1893. It seems to us that the plaintiff had no standing which entitled him to maintain this action to set aside these agreements as illegal and void. Passing by the claim made by the respondents that the suit was not brought in good faith for the benefit of the plaintiff, but at the request, by the procurement, and for the benefit, of Marvel alone, and therefore the court should not entertain the suit, or afford the plaintiff relief by way of setting aside the agreements,—which claim certainly has some support in the decisions of the court (Kingman v. Railroad Co., 30 Hun, 73; Thomp. Corp. § 4567; Forrest v. Railway Co., 4 De Gex, F. & J. 126; Belmont v. Railroad Co., 52 Barb. 637; Rice v. Rockefeller, 134 N. Y. 185, 31 N. E. 907),—it would seem that the circumstances of this case, the conduct of the parties, and the delay by Mrs. Marvel and the plaintiff in asserting ownership of the 10 shares of stock upon which the action is based, and in attacking the agreements, are such as that the court should refuse this relief prayed for (Kent v. Mining Co., 78 N. Y. 159; New Britain Nat. Bank v. Cleveland Co., 91 Hun, 447, 36 N. Y. Supp. 387; Skinner v. Smith, 134 N. Y. 240, 31 N. E. 911). In Kent v. Mining Co., supra, the corporation divided the shares of its stock, which had been sold and were in the hands of lawful owners, into two classes, and gave to one class a preference over the other in sharing in the earnings of the corporation, materially and injuriously affecting the rights of the latter class. The court held that this action, if without the assent or acquiescence of the owners of the latter class of stock, was illegal, but that it was not necessary that there should have been express assent by such owners in order to work an equitable estoppel upon them, and when they neglected to promptly and actively condemn the unauthorized action, and to seek judicial relief, after knowledge of the committal of it, they would be deemed to have acquiesced in it; and, if innocent third persons had been led thereby to put themselves in a position where harm would come to them if the action was held invalid, the holders of the stock would be estopped from questioning such action. The directors passed resolutions authorizing the issue of preferred stock to the holders of all the common stock, and under these resolutions the preferred stock was issued, and taken by many of the holders of the common stock, who paid their money for it, and such money went into the business and assets of the corporation. All the holders of the common stock did not take such preferred stock. The preferred stock was dealt in by the public, and sales of the two kinds of stock were made openly

at the stock exchange at prices for the one larger than for the other kind of stock; and this went on for four years, and then this action was commenced by a holder of the common stock to declare the action of the corporation illegal, and to restrain the corporation from further action. It was held that the relief asked for should not be granted, by reason of the assent and acquiescence of the plaintiff in the action of the corporation; that the plaintiff was bound by such action, and could not allege it was illegal.

In Skinner v. Smith, supra, it was held that stockholders of a private corporation might be denied equitable relief against acts of the corporation which did not affect the public, but only the interests of its stockholders, when the stockholders asking for relief had assented to those acts, or had acquiesced therein, with full knowledge of the facts. That action was brought to set aside certain transfers of property of the corporation made and authorized by the trustees, as such, to themselves individually, and for an accounting. The court regarded the case as falling within the principle laid down in Kent v. Mining Co., supra. In New Britain Nat. Bank v. Cleveland Co., supra, there was a delay of three years to assert the invalidity of a mortgage given by the corporation, during which time the trustees had been acting under the mortgage, and the rights of third parties had become seriously affected; and it was held that the creditor bringing the action to invalidate the mortgage had been guilty of such laches as prevented it from obtaining any relief in the action. The present case is fairly within the principles laid down in the cases cited. The plaintiff, standing in the place of Mrs. Marvel, occupied a particularly inequitable position in this case. All the persons who entered into these agreements, except Marvel, supposed that the owners of the entire capital stock of the corporation became parties to the agreements when they were so executed. The records of the corporation so indicated, and the agreement so recited. The transfer of the stock by Marvel to his wife was kept a secret from all the other parties to the agreements, and was a fraud upon them. By the terms of the agreements, Marvel was to receive $100,000 from the moneys realized from the trust fund before any distribution was made generally to the stockholders of the corporation. It is not likely any such agreements would have been made without Mrs. Marvel's being a party thereto, if it had been known this transfer of stock to her had been made. She came here with her husband just before the agreements were made, and was here when the stock was transferred to her. Marvel transferred the stock to her without consideration, and for a purpose; and, when the time came, she, at his request and by his procurement, transferred the 10 shares of stock to the plaintiff. It may be inferred from the circumstances that she had at least a general knowledge of the agreements, and that proceedings were being taken thereunder; and yet from May, 1888, until June, 1891, she stood by, and did nothing and said nothing, made no objection to the agreements, took no action with reference to them, and allowed innocent third persons to deal with the trustees under the agreements on the assumption that all the stockholders were parties to the agreements, and the agreements

were therefore valid. She was thus guilty of such laches as prevented her and her assignor from obtaining the relief asked for in this action,—the setting aside of these agreements. This action is the result wholly of a trick and fraud practiced by Marvel upon his associates whom he had induced to invest their money in the enterprise, and it should not be allowed to succeed. There is no claim made that Mrs. Marvel or the plaintiff ever paid a cent for the 10 shares of stock, or that the shares have ever been rendered less valuable by reason of the making of these agreements. We think that sufficient grounds for supporting the decision of the referee dismissing the complaint are to be found in the laches of plaintiff's assignor, Mrs. Marvel. Moreover, there is no ground for claiming that there was any fraud or dishonesty on the part of the respondents in making the agreements; and it is said in Skinner v. Smith, supra, that while a contract entered into by a corporation, by the authority or direction of its trustees, with themselves, and for their benefit, or a transfer of its property by the authority of the trustees to themselves, may be set aside in case it injures any public interest, or the private interest of any shareholder or creditor, even though the contract or transfer was executed in good faith by the trustees, yet this rule is not broad enough to condemn as void, on the ground of public policy, all contracts and transfers executed by a purely private business corporation with or to its trustees in good faith, in case no public or private interest is harmed thereby; such contracts not being void, but voidable at the election of those who are affected thereby. This case appears to be within this principle. No public interest is here involved, and it is not claimed that any private interest of the plaintiff was injuriously affected by the making of these agreements. The action could not be maintained upon the basis of the assignment by Marvel to the plaintiff of an equitable interest in the stock of the company, because Marvel held the same interest. When the agreements were made, he could not himself have maintained the action, and the plaintiff, as assignee, has no greater rights than his assignor had at the time of the assignment. We think the complaint was, for the reasons stated, properly dismissed.

The referee, having dismissed the complaint, proceeded to take the accounting with the trustee, Stone, without objection by any of the parties to the action. It is said that the accounting could not be taken, because Mrs. Marvel, the owner of 20 shares of the stock, was not a party to the action. If she had any rights as the holder of this stock, they could not, of course, be taken away by any decision or judgment made or rendered in this case. We do not see, however, how the plaintiff or Marvel can complain of the action of the referee in taking the accounting. The trustee proceeded to act under the trust agreements, and made prompt and diligent efforts to dispose of the property transferred to him in trust. It was a difficult undertaking, and, considering the condition of things, almost impossible of execution. The record discloses the situation of the property, the railroad, and the mines, and the continual opposition made by Marvel from the first to any sort of agreement or negotiations attempted to be made or had by the trustee. We need not go

into the details here. It is a wonder that the trustee was able to accomplish anything whatever under the adverse circumstances sur· rounding him. He finally succeeded in making a contract whereby he sold the railroad property and the 9,940 shares of the stock of the corporation (not including Marvel's 30 shares, Mrs. Marvel's 20 shares, and plaintiff's 10 shares), October 31, 1891, for the sum of £30,000, to be paid for in first mortgage bonds upon the property sold, bearing 6 per cent. interest; and the property was transferred, and the bonds were finally received by the trustee in the latter part of May, 1892. This action was commenced in April, 1893. The trustee made and filed with the referee, December 9, 1893, his account of the moneys received and paid out; and the referee passed upon the account, holding that the trustee should be charged with the bonds remaining in his hands December 5, 1893, as cash at par, £21,400, to be distributed under the trust agreements: (1) To paying costs and expenses of the accounting; (2) to paying trustee's commissions; (3) to repaying the trustee a cash balance found due him of $10,871.41; (4) the balance towards paying indebtedness to Stone by the partnership of $120,000 and interest from October 15, 1887.

It is claimed in behalf of the appellants that the trustee was guilty of a breach of the trust agreements in selling the railroad property absolutely, instead of organizing a corporation and transferring the property to such corporation, and taking the entire stock for such property, under the third subdivision of the agreement of May 15, 1888. An examination, however, of this subdivision in connection with subdivisions 5 and 6, and of the agreement of May 16, 1888, leads to the construction of the whole of the agreements given by the referee, that a discretion was given to the trustee to sell as he did do. Under the difficulties surrounding the trustee, and in view of the opposition of Marvel, the trustee evidently made the only disposition and the best one that was possible. The referee in settling. the accounts of the trustee was as favorable to the contestants, the plaintiff and Marvel, as he could be, and we think they have no cause for complaint as to the items allowed on either side.

There were some exceptions taken by the respondents, which do not seem to us of sufficient merit to require a reversal of the judgment. We think the judgment should be affirmed, with costs. All concur.